# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

Nº 04 Civ. 4607 (RJS)

_____

TIFFANY (NJ) INC. AND TIFFANY AND COMPANY,

Plaintiffs,

VERSUS

EBAY, INC.,

Defendant.

_____

OPINION AFTER BENCH TRIAL
July 14, 2008

_____

RICHARD J. SULLIVAN, District Judge:

Tiffany, the famous jeweler with the coveted blue boxes, brings this action against eBay, the prominent online marketplace, for the sale of counterfeit Tiffany silver jewelry on its website. Specifically, Tiffany alleges that hundreds of thousands of counterfeit silver jewelry items were offered for sale on eBay's website from 2003 to 2006. Tiffany seeks to hold eBay liable for direct and contributory trademark infringement, unfair competition, false advertising, and direct and contributory trademark dilution, on the grounds that eBay facilitated and allowed these counterfeit items to be sold on its website.

Tiffany acknowledges that individual sellers, rather than eBay, are responsible for listing and selling counterfeit Tiffany items. Nevertheless, Tiffany argues that eBay was on notice that a problem existed and accordingly, that eBay had the obligation to investigate and control the illegal activities of these sellers — specifically, by preemptively refusing to post any listing offering five or more Tiffany items and by immediately suspending sellers upon learning of Tiffany's belief that the seller had engaged in

potentially infringing activity. In response, eBay contends that it is Tiffany's burden, not eBay's, to monitor the eBay website for counterfeits and to bring counterfeits to eBay's attention. eBay claims that in practice, when potentially infringing listings were reported to eBay, eBay immediately removed the offending listings. It is clear that Tiffany and eBay alike have an interest in eliminating counterfeit Tiffany merchandise from eBay — Tiffany to protect its famous brand name, and eBay to preserve the reputation of its website as a safe place to do business. Accordingly, the heart of this dispute is not whether counterfeit Tiffany jewelry should flourish on eBay, but rather, who should bear the burden of policing Tiffany's valuable trademarks in Internet commerce.

Having held a bench trial in this action, the Court issues the following Findings of Fact and Conclusions of Law, as required by Rule 52(a) of the Federal Rules of Civil Procedure. Specifically, after carefully considering the evidence introduced at trial, the arguments of counsel, and the law pertaining to this matter, the Court concludes that Tiffany has failed to carry its burden with respect to each claim alleged in the complaint. First, the Court finds that eBay's use of Tiffany's trademarks in its advertising, on its homepage, and in sponsored links purchased through Yahoo! and Google, is a protected, nominative fair use of the marks.

Second, the Court finds that eBay is not liable for contributory trademark infringement. In determining whether eBay is liable, the standard is not whether eBay could reasonably anticipate possible infringement, but rather whether eBay continued to supply its services to sellers when it knew or had reason to know of infringement by those sellers. *See Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854 (1982). Indeed, the Supreme Court has specifically disavowed the reasonable anticipation standard as a "watered down" and incorrect standard. *Id.* at 854 n.13. Here, when Tiffany put eBay on notice of specific items that Tiffany believed to be infringing, eBay immediately removed those listings. eBay refused, however, to monitor its website and preemptively remove listings of Tiffany jewelry before the listings became public. The law does not impose liability for contributory trademark infringement on eBay for its refusal to take such preemptive steps in light of eBay's "reasonable anticipation" or generalized knowledge that counterfeit goods might be sold on its website. Quite simply, the law demands more specific knowledge as to which items are infringing and which seller is listing those items before requiring eBay to take action.

The result of the application of this legal standard is that Tiffany must ultimately bear the burden of protecting its trademark. Policymakers may yet decide that the law as it stands is inadequate to protect rights owners in light of the increasing scope of Internet commerce and the concomitant rise in potential trademark infringement. Nevertheless, under the law as it currently stands, it does not matter whether eBay or Tiffany could more efficiently bear the burden of policing the eBay website for Tiffany counterfeits — an open question left unresolved by this trial. Instead, the issue is whether eBay continued to provide its website to sellers when eBay knew or had reason to know that those sellers were using the website to traffic in counterfeit Tiffany

jewelry. The Court finds that when eBay possessed the requisite knowledge, it took appropriate steps to remove listings and suspend service. Under these circumstances, the Court declines to impose liability for contributory trademark infringement.

Third, the Court finds that Tiffany has failed to meet its burden in proving its claims for unfair competition. Fourth, in regard to Tiffany's claim for false advertising, the Court concludes that eBay's use of the Tiffany trademarks in advertising is a protected, nominative fair use of the marks. Finally, the Court finds that Tiffany has failed to prove that eBay's use of the TIFFANY Marks is likely to cause dilution. Even assuming *arguendo* that Tiffany could be said to have made out a claim for trademark dilution, the Court finds that eBay's use of the marks is protected by the statutory defense of nominative fair use.

Accordingly, the Court hereby enters judgment for eBay. The Court's judgment is supported by the following Findings of Fact and Conclusions of Law.

I. PROCEDURAL HISTORY

Plaintiffs Tiffany (NJ) Inc. and Tiffany and Company[1] commenced this action on June 18, 2004.[2] The Amended Complaint, filed on July 15, 2004, alleges that defendant eBay, Inc. ("eBay") is liable, *inter alia*, for direct and contributory infringement of Tiffany's trademarks by virtue of the assistance that it provides to, and the profits it derives from, individuals who sell counterfeit Tiffany goods on eBay. Specifically, Tiffany's Amended Complaint asserts the following six causes of action: (1) direct and contributory trademark infringement of Tiffany's trademarks in violation of Sections 32(1), 15 U.S.C. § 1114(1), and 34(d), 15 U.S.C. § 1116(d), of the Lanham Act; (2) trademark infringement and the use of false descriptions and representations in violation of Sections 43(a)(1)(A) and (B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and (B); (3) direct and contributory trademark infringement under common law; (4) direct and contributory unfair competition under common law; (5) trademark dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); and (6) trademark dilution in violation of New York General Business Law § 360-1.

In anticipation of trial, the parties filed a Joint Pretrial Order ("PTO") on October 6, 2006, including those facts to which both parties stipulated. In April 2007, the parties filed Proposed Findings of Fact and Law ("Pr. Findings") as well as Pretrial Memoranda ("Pretrial Mem.").[3]

---

[1] The two Tiffany corporate entities are hereinafter collectively referred to as "Tiffany."

[2] The case was originally assigned to the Honorable Naomi Reice Buchwald, District Judge. On November 3, 2005, the case was reassigned to the Honorable Kenneth M. Karas, District Judge. On September 4, 2007, the case was reassigned to my docket.

[3] Defendant eBay also filed two motions *in limine*, seeking to exclude 1) expert witness testimony from George Mantis, and 2) evidence relating to trademarks identified for the first time in Tiffany's Proposed Findings of Fact. The motions were, respectively, denied and granted on November 9, 2007. *See Tiffany (NJ) Inc. v. eBay, Inc.*, 75 Fed. R. Evid. Serv. 109, 109 (S.D.N.Y. 2007) (denying motion); *Tiffany (NJ) Inc. v. eBay, Inc.*, No. 04 Civ. 4607 (RJS), 2007 WL 4104037, at *1 (S.D.N.Y. Nov. 9, 2007) (granting motion).

The case proceeded to trial on November 13, 2007. The trial was conducted without objection in accordance with the Court's Individual Rules for the conduct of non-jury proceedings. The parties submitted affidavits containing the direct testimony of their respective witnesses, as well as copies of all the exhibits and deposition testimony that they intended to offer as evidence in chief at trial. eBay chose to cross-examine only four of Tiffany's seventeen witnesses,[4] noting in opening arguments that the facts of the case were not complicated — and indeed, that many were not in dispute. (Trial Transcript ("Tr.") 28:18-29:7.) Tiffany cross-examined all three of eBay's witnesses. Closing arguments took place on November 20, 2007. The parties each submitted a post-trial memorandum ("Post-Trial Mem.") on December 7, 2007.

By letter dated July 3, 2008, Tiffany requested that the Court recognize a decision issued on June 30, 2008, by the Commercial Court of Paris, France, and give preclusive effect to factual determinations made therein. A conference regarding this request was held with the Court on July 8, 2008. Tiffany subsequently withdrew the request by letter dated July 9, 2008.

## II. FINDINGS OF FACT[5]

### A. The Parties

Plaintiff Tiffany and Company is a New York corporation with its principal place of business in New York, New York. (PTO at 7.) Plaintiff Tiffany (NJ) Inc. is a New Jersey corporation with its principal place of business in Parsippany, New Jersey. (*Id.*) Defendant eBay, Inc. is a Delaware corporation with its principal place of business in San Jose, California. (*Id.*)

### B. Tiffany and Its Business

#### 1. Tiffany's Famous Marks

Over its 170-year history, Tiffany has achieved great renown as a purveyor of high-quality and luxury goods under the TIFFANY Marks (defined below), including jewelry, watches, and home items such as china, crystal, and clocks. (*Id.*; Kowalski Decl. ¶¶ 4, 7.) The TIFFANY Marks are indisputably famous, and are a valuable asset owned by Tiffany. (Naggiar Decl. ¶ 4.) The protection of the quality and integrity of the brand and the trademarks is critical to Tiffany's success as a retailer of luxury goods. (Kowalski Decl. ¶ 4.)

Tiffany is the exclusive licensee and user of the TIFFANY, TIFFANY & CO., and T & CO. trademarks, including those trademarks registered on the Principal Register of the United States Patent and Trademark Office bearing Registration Nos. 23,573, 133,063,

---

[4] At the Court's request, a fifth witness for the Plaintiff, Michael Kowalski, Chairman of the Board of Directors and Chief Executive Officer of Tiffany, was cross-examined by the Defendants before the close of the evidence.

[5] To the extent that any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law, and vice-versa.

1,228,189, 1,228,409, and 1,669,335 for jewelry, watches and decorative art objects. (PTO at 7.) In addition, Tiffany & Co. is the exclusive licensee and user of trademarks for the design of jewelry, registered on the Principal Register of the United States Patent and Trademark Office bearing Registration Nos. 1,804,353 and 1,785,204. (PTO at 7.) The first of these two marks is registered for a kidney bean-shaped design, to be used for jewelry, namely, earrings, necklaces, bracelets, pendants, cufflinks, and rings. (Am. Compl. ¶ 12.) The second design mark is registered for a cross design, to be used for jewelry, namely, pins, pierced earrings, ear clips, bracelets, necklaces, rings, and brooches. (*Id.*) The foregoing marks are collectively referred to herein as the "TIFFANY Marks." (PTO at 7.)[6]

### 2. Tiffany's Quality Control and Distribution

Because the issues disputed at trial included (1) the effectiveness of Tiffany's authentication and quality control procedures, and (2) the integrity of Tiffany's distribution channels, the Court makes the following factual findings with respect to these issues. The first issue is relevant to which party is best able to identify counterfeit jewelry. The second issue is arguably relevant to the availability of authentic Tiffany merchandise in secondary markets such as eBay.

In order to maintain its reputation for high-quality jewelry, Tiffany quality control personnel inspect Tiffany merchandise before

it is released for distribution. (Callan Decl. ¶¶ 5, 8, 10.) Before a silver jewelry item can be released to Tiffany's channels of trade, the item must satisfy Tiffany's exacting standards for, *inter alia*, composition, quality, shape, and polish of the metal, as well as the quality and integrity of the TIFFANY Marks appearing on the item. (*Id.* at ¶¶ 8, 12.) To determine if an item is authentic Tiffany silver jewelry, Tiffany quality inspectors must be able to physically inspect each item.[7] (Tr. 32: 5-6; 64:18-23.) Tiffany closely protects its quality standards and does not make them available to the public or to other jewelry manufacturers. (Tr. 35:5-36:4.)

Tiffany closely controls the distribution of Tiffany-branded goods. (Kowalski Decl. ¶ 20; Zalewska Decl. ¶¶ 9-10.) Since 2000, all new Tiffany jewelry sold in the United States has been available only through Tiffany retail stores, Tiffany catalogs, the Tiffany website (www.tiffany.com), and through Tiffany's

---

[6] The TIFFANY Marks are valid and subsisting. (PTO at 7.) The marks bearing Registration Nos. 1,228,189, 1,228,409, 1,804,353, and 1,785,204 have become incontestable. (*Id.*)

[7] By contrast, in some circumstances, it is *possible* to determine if an item is counterfeit without physically inspecting the item. For example, if one or more of the TIFFANY Marks appeared on a piece of silver jewelry bearing a "double heart" design, someone who is familiar with Tiffany's products could instantly determine that the piece is a counterfeit based on a photograph, because Tiffany does not make that particular "double heart" design. (Zalewska Decl. ¶ 23.) As another example, someone who is familiar with Tiffany's products could see from a photograph that the TIFFANY Marks were in the wrong place on a given piece of jewelry, and thus determine that the product was counterfeit. (Tr. 66:11-25.) Of course, in many instances, determining whether an item is counterfeit will require a physical inspection of the item, and some degree of expertise on the part of the examiner.

Corporate Sales Department.[8] (Kowalski Decl. ¶ 8; Cepek Decl. ¶ 10; Shibley Decl. ¶ 3.) Tiffany does not sell or authorize the sale of Tiffany merchandise on eBay or other on-line marketplaces. More generally, Tiffany does not use liquidators, sell overstock merchandise, or put its goods on sale at discounted prices. (Zalewska Decl. ¶¶ 8, 10.) In addition, Tiffany has a general policy of refusing to sell more than five of the same new items to any individual customer at any given time without the approval of the retail store manager. However, as noted below, the five-or-more policy has been sporadically applied on a case-by-case basis. (Tr. 134:17-18.)

There are only two ways in which Tiffany sells significant quantities of merchandise at discounted or wholesale prices. First, the Tiffany Corporate Sales Department sells certain Tiffany items to corporate accounts. (Shibley Decl. ¶ 4.) Second, Tiffany sells merchandise to its international trade accounts at wholesale prices. (Chen Decl. ¶¶ 3, 4.) The evidence does not show, however, that Tiffany's international trade accounts or corporate sales programs are responsible for the diversion of silver jewelry or for counterfeiting of any kind. (Cepek Decl. ¶ 15; Chen Decl. ¶¶ 13-16; Shibley Decl. ¶¶ 7-9.) Nor is there evidence that during the time

at issue, from 2003 to 2006, the prices of Tiffany jewelry pieces sold in various locations have differed such that there would be incentives for purchasers to buy jewelry at a low price in one location and sell it in another country (or on eBay) for higher prices. (Zalewska Decl. ¶ 8; Chen Decl. ¶ 15.)

eBay does not seriously contest the fact that Tiffany's distribution chain is tightly controlled. Nor has eBay presented evidence of diversion of silver jewelry during the relevant time period, 2003 to 2006. Nevertheless, the relative merits of Tiffany's internal diversion controls are of marginal relevance to this litigation, as they provide little insight into the actual size and scope of the legitimate secondary market in authentic Tiffany silver jewelry. Indeed, the trial record contains virtually no testimony, expert or otherwise, on the crucial topic of the size of the legitimate secondary market in Tiffany goods. This deficiency is significant, since the law clearly protects such secondary markets in authentic goods. *See Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61-62 (2d Cir. 1992) ("As a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner."). Thus, while rights holders such as Tiffany may have obvious economic incentives to curtail the sale of both counterfeit and authentic goods on the Internet — after all, every sale of Tiffany jewelry on eBay potentially represents a lost sales opportunity via Tiffany's own authorized distribution channels — the law provides protection only from the former, not the latter. Clearly, eBay and other online market websites may properly promote and facilitate the growth of

---

[8] Tiffany closed its domestic wholesale division in the fall of 1999, and by mid-2000, all of the United States accounts in that division had been closed. (Cepek Decl. ¶ 10.) There is no evidence of any diversion of silver jewelry from the domestic wholesale accounts. (Cepek Decl. ¶¶ 12-13.) Tiffany defines diversion as "the act of taking legitimate product from authorized sales channels, by legitimate or illegitimate means, and making it available for sale through unauthorized sales channels." (Pl.'s Ex. 3, at 2.)

legitimate secondary markets in brand-name goods. *See Dow Jones & Co. v. Int'l Sec. Exch., Inc.*, 451 F.3d 295, 308 (2d Cir. N.Y. 2006) ("While a trademark conveys an exclusive right to the use of a mark in commerce in the area reserved, that right generally does not prevent one who trades a branded product from accurately describing it by its brand name, so long as the trader does not create confusion by implying an affiliation with the owner of the product."). Unfortunately, the trial record offers little basis from which to discern the actual availability of authentic Tiffany silver jewelry in the secondary market.[9]

## C. eBay and Its Business

### 1. eBay's Listings, Buyers, and Sellers

eBay is a well-known online marketplace, located at www.ebay.com, that allows eBay sellers to sell goods directly to eBay buyers. (PTO at 7.) The listings are created and posted by third-party users, who register with eBay and agree to abide by a User Agreement. (*Id.*) While users often go by descriptive user names instead of their real names, users are required to supply identifying information to eBay when registering. (Briggs Decl. ¶ 13.) Sellers can also use multiple user names. (Tr. 671:18-672:2.)

To conduct a transaction on eBay, registered sellers choose the appropriate category for their listed item, including, for example, Jewelry and Watches, Toys and Hobbies, Collectibles, or Health and Beauty. (Briggs Decl. ¶ 15.) Sellers then create a listing for the item that they wish to sell. (*Id.* at ¶¶ 10, 12.) A listing can include either a single item or several items (also known as a "Dutch auction"). (*Id.* at ¶ 16; Zalewska Decl. ¶ 27.) In addition, sellers can post multiple listings at any given time, including multiple listings for the same type of item or one listing with multiple quantities of the same item. (Def.'s Ex. 77 at 3; Zalewska Decl. ¶ 80.)

While eBay is perhaps best known for auction-style listings, sellers can also choose to sell their goods through fixed price or "Buy It Now" listings.[10] (Briggs Decl. ¶¶ 9, 15.) Sellers are responsible for setting the parameters and conditions of the sale, including the minimum acceptable bid, the Buy It Now price (if applicable), and the duration of the listing. Sellers are also responsible for the content of the listings, including the titles and descriptions of the items. (Def.'s Ex. 77; Briggs Decl. ¶ 12.)

Separately, eBay offers a classified ad service, through which sellers can publish the

---

[9] Tiffany's return policy provides that with a receipt, Tiffany merchandise can be returned in saleable condition within thirty days for a full cash refund. Without a receipt or after thirty days, Tiffany jewelry can be returned in saleable condition for a store credit (Zalewska Decl. ¶ 21.) In light of this policy, it would not be difficult to imagine the development of an efficient secondary market involving buyers willing to pay cash for unwanted and otherwise non-returnable retail Tiffany merchandise, which might then be offered for resale in larger quantities via eBay and other distribution channels. However, the scope and extent of such a secondary market was not developed at trial.

---

[10] A "Buy It Now" option is a hybrid between an auction and a fixed price sale. In such a listing, the item sells at a fixed price only if a buyer is willing to meet the Buy It Now price before the first bid comes in.

availability of goods for sale. (Tr. 399:6 - 401:4.) This classified ad service is available only for certain categories and subcategories of goods, and is priced differently than eBay's ordinary listings. Unlike the previously described eBay listings, the classified ad service is a straightforward service analogous to the classified ad section of a local newspaper. (*Id.* at 401:2-4.)

Potential buyers can view listings on eBay in several ways. Buyers can click on keywords on the eBay home page, which bring them to pages of listings for products including those keywords. Buyers can also browse through eBay categories or use keywords to search through listing titles and descriptions. To bid on items, buyers, like sellers, must register with eBay. (Briggs Decl. ¶ 13.)

eBay's role is to connect buyers and sellers and to enable transactions, which are carried out directly between eBay members. When a buyer purchases an item, the buyer and seller contact each other to arrange for payment and shipment of the goods. (*Id.* at ¶ 19.) While eBay provides the venue for the sale and support for the transaction, it does not itself sell the items. (*Id.*) Indeed, items sold on eBay are never in eBay's physical possession. (PTO at 7; Chesnut Decl. ¶ 41; Briggs Decl. ¶¶ 10-11.) eBay generally does not know whether or when an item is delivered to the buyer. (Briggs Decl. ¶¶ 10-11.)

eBay has become very successful: more than six million new listings are posted on eBay daily, and at any given time, some 100 million listings appear on the website. (*Id.* ¶ 9.)

### 2. eBay's Business Model and Support to Sellers

eBay's business model is based on two components: first, the creation of listings, and second, the successful completion of sales between the seller and the buyer. For each posted listing, sellers pay an initial insertion fee, ranging from $0.20 to $4.80 depending on the starting price. If the item is successfully sold, sellers pay a final value fee based upon the final price for the item. Final value fees range from 5.25% to 10% of the final price of the item. (Briggs Decl. ¶ 20; Pl.'s Ex. 1151.) In addition, sellers who opt for various additional features to differentiate their listings, such as a border or bold-faced type, are charged additional fees. (Briggs Decl. ¶ 20.)

In this way, eBay's revenue is based on sellers using eBay to list their products and successfully completing sales through eBay. Gary Briggs, eBay's Chief Marketing Officer, testified that in 2006, approximately 33% of eBay North America's income was derived from listing fees and approximately 45% from final value fees. (Tr. 407:3-407:9.) eBay also profits from fees charged by PayPal, an eBay company, to process the transaction. (*Id.* at 393:4-393:16.) PayPal charges the eBay seller a fee ranging from 1.9% to 2.9% of the sale price, plus $0.30. (Pl.'s Ex. 1156.)

Because eBay's revenue and profit growth is dependent, in significant part, on the completion of sales between eBay sellers and eBay buyers, eBay works closely with sellers to foster the increase of their sales on eBay, including the sales of Tiffany jewelry. (Zeig Dep. Tr. 141:21-145:4; Tr. 406:18-407:25; Pl.'s Exs. 124, 129.) As Briggs testified,

eBay "want[s] to have [its] sellers understand what buyers are interested in, and [it] feels that [it is] very much in the business of trying to help [its] sellers succeed." (Tr. 406:23-407:2.)

This assistance includes seminars and workshops to educate sellers on growing their business. (*Id.* at 403:11-403:14; Pl.'s Exs. 981, 989.) eBay also offers marketing advice about creating the "perfect" listing to attract buyers (Tr. 415:20-417:1; Pl.'s Ex. 1015), and offers an "Advanced Selling" program that provides its sellers with data and research to help them identify "hot sales opportunities" (Tr. 406:4-406:16; Pl.'s Ex. 987). In addition, eBay distributes marketing calendars so that its sellers can list goods to coincide with eBay promotions (Tr. 409:2-409:19; Pl.'s Ex. 985), as well as "expert" consultants, whom eBay sellers may call to receive advice on growing their business (Tr. 409:25-411:4; Pl.'s Ex. 990). eBay also has a "Main Street Program," which encourages sellers to lobby government officials regarding regulations and legislation that may affect their sales and eBay's business. (Tr. 413:7-413:22; Pl.'s Ex. 1024.)

Some users who regularly sell large quantities of merchandise through eBay are designated as "PowerSellers." eBay provides PowerSellers with more assistance and benefits. (Tr. 401:10-401:23.) As Briggs testified, the bigger the seller, the more support eBay provides. (*Id.*) During the relevant time period, eBay provided PowerSellers with dedicated account managers; special newsletters with further information on eBay promotions; advanced selling education; reimbursements of 25% of the cost of qualifying advertisements; and access to health care benefits, business liability insurance, and working lines of credit to finance their business. (*Id.* at 423:6-423:12, 423:17-424:4, 427:7-427:14, 438:19-439:20, 440:3-440:20; Pl.'s Exs. 52, 62, 129, 397, 406.)

### 3. eBay's Control Over Sales Made On Its Website

eBay is an electronic marketplace, not a retailer. Thus, eBay itself never takes physical possession of the goods sold through its website; instead, it facilitates a transaction between two independent parties. (Chesnut Decl. ¶ 41; Briggs Decl. ¶¶ 10-11.) Nevertheless, eBay exercises some limited control over those who trade on its website by requiring all users to register with eBay and sign eBay's User Agreement. (Briggs Decl. ¶ 13; Def.'s Ex. 77.) The User Agreement requires users to refrain from violating any laws, third party rights, including intellectual property rights, and eBay policies. If a user violates the terms or conditions of the User Agreement, eBay may take disciplinary action against the seller, including removing the seller's listings, issuing a warning, and/or suspending the user. (Briggs Decl. ¶ 14.)

In addition to exercising some control over users, eBay also restricts the types of items which can be listed on its website. For example, eBay maintains a list of prohibited items, *e.g.*, drugs, firearms, and alcohol, for which it routinely screens in order to prevent such items from being offered for sale on eBay. (Pl.'s Ex. 4.)

### 4. eBay's Anti-Fraud Efforts

#### a. Trust and Safety Department

eBay has made substantial investments in anti-counterfeiting initiatives. (Tr. 686:14-15, 687:5-8.) eBay has invested as much as $20 million each year on tools to promote trust and safety on its website. (*Id.* at 687:21-25.) One quarter of eBay's workforce of roughly 16,000 employees is devoted to trust and safety. (*Id.* at 691:18-692:7.) Of these 4,000 individuals, approximately 2,000 serve as eBay Customer Service Representatives "(CSRs"). (Chesnut Decl. ¶ 20.) More than 200 of these individuals focus exclusively on combating infringement, at a significant cost to eBay. (Tr. at 597:24-580:8, 687:9-14.) eBay also employs 70 persons who work exclusively with law enforcement. (*Id.* at 599:1-2, 746:21-747:19; Chesnut Decl. ¶¶ 56-57.) In several instances, information that eBay has provided to law enforcement agencies has led to the arrest of counterfeiters. (Chesnut Decl. ¶¶ 56-57.)[11]

---

[11] Congress has criminalized trafficking in counterfeit goods. *See* 18 U.S.C. § 2320. However, according to the Clerk of this Court, from 2003 to the present date, the United States Attorney's Office for the Southern District of New York has prosecuted only 24 cases under this statute. Moreover, the United States Attorney's Office for the Southern District of New York has apparently adopted a policy of declining prosecutions against "mere sellers" of counterfeit goods. *See, e.g., United States v. Huang*, No. 06 Crim. 1006 (RJS), Transcript of May 20, 2008 Conference at 17-21. This suggests that law enforcement efforts have been relatively modest in addressing what has been characterized as a multi-hundred-billion dollar problem. *See* Matthew Benjamin, *A World of Fakes*, U.S. News and World Report, July 14, 2003, at 46-47 (annual cost of counterfeit goods to the U.S. economy estimated at $200-250 billion).

#### b. Fraud Engine

Between December 2000 and May 2002, eBay manually searched for keywords in listings in an effort to identify blatant instances of potentially infringing or otherwise problematic activity. (*Id.* at ¶ 34.) In May 2002, eBay began using technology to perform that function. (*Id.*) These technological tools are known as the eBay fraud engine. (*Id.*) The fraud engine uses rules and complex models that automatically search for activity that violates eBay policies. (*Id.*) eBay spends over $5 million per year in maintaining and enhancing its fraud engine, which is principally dedicated to ferreting out illegal listings, including counterfeit listings. (Tr. 687:15-18.)

The fraud engine currently uses more than 13,000 different search rules, and was designed in part to capture listings that contain indicia of counterfeiting apparent on the face of the listings without requiring expertise in rights owners' brands or products. (Chesnut Decl. ¶ 35.) The fraud engine thus was developed to monitor the website and flag or remove listings that, among other things, explicitly offered counterfeit items, contained blatant disclaimers of genuineness, or included statements that the seller could not guarantee the authenticity of the items. For example, at all times relevant to this litigation, eBay monitored its website for and removed listings that expressly offered "knock-off," "counterfeit," "replica," or "pirated" merchandise, and listings in which the seller stated he "cannot guarantee the authenticity" of the items being offered. (*Id.*; Tr. 581:11-584:22; Def.'s Exs. 125, 135.) For obvious reasons, the fraud engine could not determine whether a listed item was actually counterfeit.

(Chesnut Decl. ¶ 35.) However, the fraud engine also contained numerous other data elements designed to evaluate listings based on, for example, the seller's Internet protocol address, any issues associated with the seller's account on eBay, and the feedback the seller has received from other eBay users. (*Id*. at ¶ 36.) Between 2003 and the close of discovery in 2006, eBay modified and updated its fraud engine at least weekly. (*Id*.)

At all times relevant to this case, eBay's fraud engine flagged thousands of listings on a daily basis that contained obvious indicia of infringing or otherwise fraudulent activity. (*Id*. at ¶ 38.) Listings flagged by the fraud engine were sent to eBay's CSRs for review and possible further action. (*Id*.) In reviewing the flagged listings, CSRs examined multiple factors according to eBay guidelines in order to make a decision as to whether a violation of eBay policies had occurred, including the language and sophistication of the listing, the seller's history and feedback rating from past buyers, the seller's business model, and the seller's eBay registration information. (*Id*.)

Upon reviewing a potentially infringing, fraudulent, or problematic listing, the CSR would: (1) remove the listing from eBay; (2) send a warning to the seller; (3) place restrictions on the seller's account, such as a selling restriction, temporary suspension, or indefinite suspension; and/or (4) refer the matter to law enforcement. (*Id*. at ¶ 39.) eBay removed thousands of listings per month based on CSR reviews of listings captured by the fraud engine. (Chesnut Decl. ¶¶ 38-39; Def.'s Ex. 13.) At all times relevant to this litigation, CSRs' decisions were guided by standards and guidelines put in place by

eBay lawyers and staff members, and the action taken was based upon the seriousness of the violation. (*Id*.) Nevertheless, eBay's ultimate ability to make determinations as to infringement was limited by virtue of the fact that eBay never saw or inspected the merchandise in the listings. While some items — such as guns — were completely prohibited and thus required no judgment to remove, listings that offered potentially infringing and/or counterfeit items required a more in-depth review. (Tr. 582:23-584:17.)

c. The VeRO Program

In addition to the fraud engine, eBay has, for nearly a decade, maintained a set of procedures, known as the Verified Rights Owner ("VeRO") Program, to address listings offering potentially infringing items posted on the eBay website. (Chesnut Decl. ¶ 15.) At all times relevant to this litigation, the VeRO Program was a "notice-and-takedown" system, whereby rights owners could report to eBay any listing offering potentially infringing items, so that eBay could remove such reported listings. (*Id*. at ¶ 16.) At the present time, more than 14,000 rights owners, including Tiffany, participate in the VeRO Program. (*Id*. at ¶ 17.)

At all times, eBay's VeRO Program rested on the responsibility of rights owners to police their own trademarks. Under the VeRO Program, a rights owner who saw a potentially infringing item listed on eBay could report the listing directly to eBay, by submitting a Notice of Claimed Infringement form or "NOCI". (*Id*. at ¶ 18; *see* Def.'s Exs. 29, 84.) A NOCI attested that the rights owner possessed a "good-faith belief" that the item infringed on a copyright or a trademark.

(Chesnut Decl. ¶ 16.) NOCIs could be faxed to eBay, emailed to eBay, or reported to eBay via a software tool called the VeRO Reporting Tool. (Def.'s Ex. 94; Pl.'s Ex. 154; Chesnut Decl. ¶ 18.) As part of the VeRO Program, eBay offered rights owners tools to assist in efficiently identifying potentially infringing listings. These included the VeRO Reporting Tool as well as an automated search tool called "My Favorite Searches." (Chesnut Decl. ¶ 23.) These tools allowed rights owners to search automatically for particular listings every day, to save their favorite searches, and to email the search results directly to the rights owner for review on a daily basis. (*Id.*)

Upon receipt of such a notice, CSRs first verified that the NOCI contained all of the required information and had indicia of accuracy. (*Id.*) Thereafter, eBay promptly removed the challenged listing. Indeed, at all times relevant to this litigation, the Court finds that eBay's practice was to remove reported listings within 24 hours of receiving a NOCI. (Tr. 712:20-21; Chesnut Decl. ¶ 21; Def.'s Ex. 26.) Seventy to 80 percent of reported listings were removed within 12 hours of notification during the time period at issue in this litigation. (Tr. 713:1-3.) At present, three quarters of the listings are removed within four hours. (*Id.* at 712: 15-16.) eBay typically removed thousands of listings per week based on the submission of NOCIs by rights holders. (Chesnut Decl. ¶ 21.)

The Court finds that when eBay removed a listing, if bidding on the listed item had not ended, eBay notified the seller and any bidders that the listing had been removed and that all bids had been cancelled. eBay also advised the seller as to the reason for the removal and provided relevant educational information to prevent the seller from later committing the same violation. (Tr. 697:20-699:5; Def.'s Ex. 55.) If bidding had ended, eBay cancelled the transaction retroactively, removed the listing, and informed both the winning bidder and the seller that the listing had been removed and that the parties should not complete the transaction. (Tr. 703:17-704:5.) Every time eBay removed a listing, eBay refunded associated fees, including listing fees, feature fees, and final value fees. (*Id.* at 699:4-14, 703:17-704:5; Chesnut Decl. ¶ 22.) Under some circumstances, eBay also reimbursed the buyer for the cost of the purchased item under eBay's or PayPal's buyer protection programs. (Chesnut Decl. ¶ 59.) One of these conditions was that the buyer present evidence that the item was, in fact, counterfeit. (Pl.'s Ex. 1146.) eBay committed "tens of millions of dollars" annually to pay claims through its buyer protection program, "and a number of counterfeit claims [were] paid every year that certainly contribute[d] to a significant part of that expense." (Tr. 688:1-5.) The Court further finds that eBay also reviewed the seller's account and routinely took further remedial action, including suspending the seller. (*Id.* at 699:22-700:9.)

d. "About Me" Page

As an additional educational tool, eBay encouraged rights owners to create an "About Me" webpage on the eBay website to inform eBay users about their products, intellectual property rights, and legal positions. (*Id.* at ¶ 44.) Sellers who had listings removed from eBay were directed to the relevant rights owner's "About Me" webpage for

information about why their listings were removed and how they could avoid posting listings for infringing items in the future. (*Id.*) Aside from monitoring for some limited content, such as profanity, eBay did not exercise any control over the content on a rights owner's "About Me" page. (*Id.*) Tiffany maintained an "About Me" page on eBay beginning in 2004. (*Id.*) Tiffany's "About Me" Page stated that "Most of the purported 'TIFFANY & CO.' silver jewelry and packaging available on eBay is counterfeit." (Pl.'s Ex. 290.) The "About Me" page explained that genuine Tiffany merchandise is available only through stores, catalogs, and Tiffany's own website, and that the manufacture and sale of counterfeit Tiffany goods on eBay is a crime. (*Id.*) The page concluded by stating that "TIFFANY & CO. RIGOROUSLY PROTECTS ITS TRADEMARKS AND COPYRIGHTS." (*Id.*)

### D. The Sale of Tiffany Goods on eBay

#### 1. eBay's Brand Management and Attempts to Develop Jewelry Sales

At all times pertinent to this litigation, eBay management teams were responsible for overseeing the growth of products sold on eBay within each formal product category, such as Jewelry & Watches. (Tr. 417:9-420:19; Poletti Dep. Tr. 13:14-13:22.) The Jewelry & Watches team ran an account management program for its twenty top sellers. (Zeig Dep. Tr. 31:13-35:16, 35:5-37:8; Tr. 417:9-419:23.) That program provided eBay's sellers with information on business planning and auction strategy consultation. (Zeig Dep. Tr. 31:13-35:16; Pl.'s Ex. 200 at 16.) In addition, eBay conducted group conference calls with sellers, in which eBay shared information on such topics as eBay's marketing programs and top-searched keywords. (Pl.'s Exs. 184, 200 at 7; Zeig Dep. Tr. 117:18-118:11.) Plaintiff's Exhibit 184, a draft of an email to eBay sellers, shows that eBay provided its sellers with "the most effective keywords for [their] program," and highlighted the words that provided the best return on investments. eBay identified "Tiffany" as one of the top-searched keywords and provided it to top sellers during these calls. (Pl.'s Ex. 184.)

In order to "boost" the sellers' sales, eBay also advised its sellers to take advantage of the demand for Tiffany merchandise as part of a broader effort to grow the Jewelry & Watches category. (Pl.'s Exs. 129, 184, 995, 1018, 1026, 1038, 1064; Tr. 457:20-460:3.) In many cases, eBay's advice was simply based on the keywords that were frequently used in searching eBay's website. For instance, in 2004, a PowerSeller newsletter to jewelry sellers advised PowerSellers to "us[e] recommended keywords to boost sales." (Pl.'s Ex. 129.) "Tiffany & Co." was among the recommended keywords provided because it had "been used often" in recent eBay searches. (*Id.*) eBay encouraged its sellers to view the eBay Pulse webpage, which tracked buyer trends, "hot picks," "top searches," and "most watched items." (Pl.'s Ex. 1026; Tr. 461:4-464:19.) In September 2006, eBay told users that the terms "Tiffany" and "Tiffany & Co." were top search terms. (Pl.'s Exs. 1038, 1164.) eBay also reported demand for Tiffany items through documents such as the "Hot Categories Report," which summarized keywords for which there was significant buyer demand. (Pl.'s Ex. 995.)

eBay actively took steps to grow the sales of Tiffany items on its website. For example, eBay provided its users with a document called the "Holiday Hot List." (Pl.'s Ex. 1018.) As eBay acknowledged, the Holiday Hot List "suggested to our sellers the types of items that our buyers will have interest in during the holiday season." (Tr. 457:20-459:3.) The Holiday Hot List distributed in the "Seller Central" section of eBay's website in September 2006 stated: "to help [sellers] prepare, we have created a detailed list of products predicted to be in high demand and short supply this holiday season." (Pl.'s Ex. 1026.) eBay included "Tiffany" on the Holiday Hot List. (Pl.'s Ex. 1018.)

eBay recognized that its "buyers are very interested in brands." (Tr. 446:21-446:25.) In order to attract potential buyers to its website, eBay devoted a significant effort to assisting the growth of eBay sellers in the Jewelry & Watches category. (*Id*. at 418:11-419:23; Poletti Dep. Tr. 13:6-13:22.) Indeed, eBay considered itself to be a competitor of Tiffany and the principal source of "value" pricing of Tiffany jewelry. (Poletti Dep. Tr. 72:19-79:22, 74:16-75:13.) eBay regularly conducted promotions to increase bidding on auctions and to increase sales of fashionable and luxury brands, including Tiffany. (Zeig Dep. Tr. 49:15-50:15, 64:5-67:6; Pl.'s Ex. 61; Pl.'s Ex. 63.)

## 2. eBay Advertised Tiffany Goods

Prior to 2003, eBay actively advertised the availability of Tiffany merchandise on its website. (Pl.'s Exs. 392, 1064.) Additionally, as with many other brand names, eBay purchased sponsored link advertisements on Yahoo! and Google advertising the availability of Tiffany items on eBay. (Briggs Decl. ¶ 25; Pl.'s Exs. 491, 1065.) After Tiffany complained to eBay in May 2003, *see infra* at Section II.E.2, eBay advised Tiffany that it had ceased purchasing those links. (Briggs Decl. ¶¶ 25, 32.) Nevertheless, eBay continued to use a third party, Commission Junction, to run what was known as the "affiliate program." Through that program, sellers who registered as "affiliates" contracted with Commission Junction and then bought sponsored links on Google. (Tr. 469:1-470:20.) In some instances, affiliates were then reimbursed for some of their costs, depending on how much business they drove to the eBay website. (*Id.*) eBay provided a lump sum to Commission Junction, which then disbursed the payments to individual affiliates. (*Id.*) Although eBay never directed its affiliates to continue purchasing Tiffany sponsored links, it did not instruct Commission Junction to preclude its affiliates from using Tiffany as a sponsored link. (Tr. 472:2-472:19.) However, the technology available at the time did not allow either Commission Junction or eBay to suppress individual terms, like Tiffany, as a general rule. Rather, if eBay had sought to suppress the term "Tiffany," eBay would have needed to do so "pretty much on a manual basis." (*Id*. at 473:14.) Based on the evidence at trial, the Court finds that eBay did not fully discontinue the practice of advertising Tiffany goods on eBay through sponsored links.

## 3. eBay Generated Revenue From The Sale of Tiffany Items

During the relevant time period, eBay generated substantial revenue from the sale of "Tiffany" silver jewelry on its website. (Poletti Dep. Tr. 59:15-62:9.) Indeed,

between April 2000 and August 2005, there were 456,551 sales of Tiffany jewelry in the Jewelry & Watches category.[12] (Pl.'s Ex. 394 at 1.) eBay's Jewelry & Watches category manager estimated that, between April 2000 and June 2004, eBay earned $4.1 million in revenue from completed listings with "Tiffany" in the listing title in the Jewelry & Watches category. (Poletti Dep. Tr. 59:15-62:9.)

E. Tiffany Identified eBay as a Major Source of Counterfeit Items

1. Tiffany Attempted to Stop Counterfeiting

In policing its valuable marks, Tiffany brought individual lawsuits against counterfeiters, including counterfeiters selling their items on eBay.[13] (Tr. 838:25-840:4; Kowalski Decl. ¶¶ 15-16.) In addition, Tiffany's CEO testified that Tiffany also pursued over 600 "enforcement actions," including customs seizures, working with domestic and international law enforcement agencies, and contacting individual eBay sellers and demanding that they cease and desist from selling counterfeit Tiffany items. (Tr. 801:2-801:21, 805:9-14.) Nevertheless, by 2003, Tiffany apparently determined that it would forego future legal action against

individual sellers of counterfeit Tiffany merchandise on eBay (*id.* at 800:20-805:6), and, instead, address the problem with eBay directly. (*Id.* at 804:11-805:6, 816:23-817:17; Kowalski Decl. ¶ 22-23.)[14]

2. Tiffany Sought Action from eBay

On May 14, 2003, Tiffany's outside counsel wrote to eBay to complain about the problem of counterfeit Tiffany jewelry on eBay, specifically noting the "deluge of counterfeit Tiffany merchandise, the vast majority of which has been sold through eBay." (Kowalski Decl. ¶ 17; Pl.'s Ex. 489.) In that letter, Tiffany advised eBay that there were no authorized third party vendors for Tiffany merchandise and that it should therefore "be apparent to eBay that any seller of a significant lot — i.e. five pieces or more — of purported 'Tiffany' jewelry is almost certainly selling counterfeit merchandise." (Kowalski Decl. ¶¶ 17-18; Pl.'s Ex. 489.) In that May 14, 2003 letter, Tiffany made three specific demands: "that eBay immediately (i) remove listings for all Tiffany counterfeit merchandise currently on the eBay website; (ii) take appropriate and continuing measures to eliminate the sale of counterfeit merchandise through the eBay website in the future; and [(iii)] cease using any 'Tiffany'

[12] This figure consists of completed sales for the following subcategories: Body Jewelry, Bracelets, Charms & Charm Bracelets, Children's Jewelry, Designer Brands, Earrings, Men's Jewelry, Necklace & Pendants, Pins & Brooches, and Rings. (Pl.'s Ex. 394.) The calculations exclude numerous types of Tiffany items not at issue in this litigation.

[13] These individual eBay sellers included Katz Jewelers, Inc., Starglam.com, Inc., Erika Hughes, and David Verbout. (Tr. 838:25-840:4; Kowalski Decl. ¶¶ 15-16.)

[14] Although eBay has criticized Tiffany's commitment to policing its trademarks, eBay does not argue, nor could it, that Tiffany has legally abandoned the TIFFANY Marks at issue here. *See ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007) ("The party asserting abandonment bears the burden of persuasion with respect to two facts: (1) non-use of the mark by the legal owner, and (2) lack of intent by that owner to resume use of the mark in the reasonably foreseeable future.")

identifier to label counterfeit goods." (Pl.'s Ex. 489.)

By a telephone conversation later confirmed in letters of June 12, 2003 (Pl.'s Ex. 490), and June 13, 2003 (Pl.'s Ex. 491), eBay responded by encouraging Tiffany to utilize the VeRO Program, as well as a third party program, Ranger Online, to expedite Tiffany's reporting of suspicious merchandise.[15] (Pl.'s Ex. 490, 491.) eBay also indicated to Tiffany that eBay monitored listings on its website and removed those that appeared, on their face, to be counterfeit. (Pl.'s Ex. 491.) Furthermore, eBay stated that if a seller had been previously warned about infringing listings, the seller's account would be suspended. (*Id.*) eBay also asked Tiffany to propose ways in which the two businesses could work together to help Tiffany protect its mark. (*Id.*) Finally, eBay noted that it would remove the sponsored link advertising for Tiffany items. (*Id.*)

However, eBay rejected Tiffany's request that eBay "remove listings that [did] not appear on their face to be offering counterfeit Tiffany items without notice from [Tiffany] that they [were] infringing." (*Id.*) In particular, eBay refused to prospectively ban listings in which the seller had listed multiple "Tiffany" items. (*Id.*; Tr. 233:15-22.) In eBay's June 13, 2003 letter to Tiffany, eBay wrote, "What you have asked us to do is to consider listings 'apparently infringing'

simply because the seller is offering multiple Tiffany items. That we are not prepared to do at this time." (Pl.'s Ex. 491.)

Almost one year later, on June 10, 2004, Tiffany once again wrote to eBay. (Pl.'s Ex. 492.) In that letter, Tiffany said that it had used the Ranger Online and VeRO Programs to report counterfeit goods. (*Id.*) Tiffany also stated that as a result of Tiffany's own survey (the "Buying Programs"), Tiffany had discovered that 73% of the sterling silver Tiffany merchandise on eBay was counterfeit, and that only 5% was genuine. (*Id.*) Tiffany concluded by demanding that eBay should "(i) ban any eBay seller from listing five (5) or more 'Tiffany' jewelry items at any given time; (ii) ban the sale of silver 'Tiffany' jewelry, the vast majority of which our analysis has shown to be counterfeit; (iii) ban the sale of any 'Tiffany' item that is advertised as being counterfeit (as some currently are) or as being 'inspired by Tiffany" (as is often the case now); (iv) not advertise the sale of 'Tiffany' merchandise and (v) remove sponsored links to 'Tiffany' on any search engine." (*Id.*) This litigation ensued.

At trial, Tiffany's CEO, Michael Kowalski, conceded that in "virtually all cases or certainly the majority of cases eBay would take down the listings for any auctions that were identified by Tiffany as suspect." (Tr. 814:18-22.) Kowalski also conceded that eBay had removed Tiffany advertising from its home pages and greeting pages, as well as its advertising on Google and Yahoo!. (*Id.* at 815:5-12.) He finally testified that the principal issue that Tiffany had with eBay was that eBay would not *prospectively* ban sellers of multiple Tiffany items, particularly

---

[15] According to Ewa Zalewska, an attorney in Tiffany's legal department and a witness at trial, while Tiffany did subsequently try using Ranger Online to facilitate reporting of counterfeit items through eBay's VERO Program, Tiffany eventually stopped using the program because Tiffany felt that it was ineffective. (Tr. 227:14-228:2; Pl.'s Ex. 816.)

when those items were sold in lots of five or more. (*Id.* at 815:13-817:11.) Kowalski stated that the crux of Tiffany's argument was that there must be a way "to stop the counterfeiting before the fact, not after the fact." (*Id.* at 817:9-10.)

F. Tiffany's Proposed "Five-or-More" Rule

Tiffany's principal unmet demand was for eBay to prospectively ban sellers of multiple Tiffany items by instituting a "five-or-more" rule. The Court finds that, as a factual matter, there is little support for Tiffany's allegation that a seller listing five or more pieces of Tiffany jewelry is presumptively trafficking in counterfeit goods. First, the precise contours of the "five-or-more" rule have shifted throughout litigation. For example, in Tiffany's pre-litigation demand letters, Tiffany asserted that all Tiffany items sold in lots of five or more are presumptively counterfeit. (Kowalski Decl. ¶¶ 18, 20.) At trial, the testimony was that, in reviewing infringing listings, Tiffany was concerned only with lots of five *identical* silver jewelry items. (Tr. 121:11-33.) At other times, Tiffany has suggested that the rule should be applied to *all* manner of Tiffany jewelry, new and old (Am. Compl. ¶ 34), while on other occasions Tiffany has asserted that the "five-or-more" rule should extend only to *new* silver Tiffany items. (Def.'s Ex. 284; Kowalski ¶ 20.)

Second, Tiffany's CEO, Michael Kowalski, testified that the "five-or-more" rule "was simply our compromised effort" to make eBay "do a better job of preventing the sale of Tiffany counterfeit merchandise through eBay." (Tr. 822:14-17.) The five-or-more rule "wasn't meant to exclusively specify the means" of enforcement, and was simply a "shorthand solution . . . that we felt was eminently reasonable from a business model consumer behavior perspective." (*Id.* at 822:17-23.)

Third, Tiffany's contention that the "five-or-more" rule is warranted in light of Tiffany's sales practices is unsupported by the record. In fact, the record shows that a practice of limiting retail sales of identical items in lots of five or more was instituted by Tiffany for a time, not as an anti-counterfeiting tool, but instead, as an anti-diversion tool — that is, to guard against the growth of a secondary market in authentic Tiffany goods. (*See, e.g.*, Def.'s Exs. 169, 197; McGowan Dep. Tr. at 76:2-77:25.) The record further shows that since 2005, the retail sales limit has grown to 25 items per customer (Tr. 833:8-12; McGowan Dep. Tr. at 76:20-77:2) — and that even that limit is not regularly enforced. (Tr. 134:7-14 (Tiffany witness testified that "the five or more policy . . . is not applied consistently); *id.* at 833:3-12.) In addition, lots of more than five Tiffany silver jewelry items are available from Tiffany through its Corporate Sales Department and international trade accounts. (*See generally* Shibley Decl.; Chen Decl.)

Finally, the record shows that lots of five or more *authentic* Tiffany items, including silver jewelry, have been sold on eBay. (*See, e.g.*, Def.'s Ex. 422; Tr. 135:16-21.)

## G. Tiffany Participated in the VeRO Program

### 1. Tiffany Filed Increasing Numbers of NOCIs

The Court finds that Tiffany attempted to curtail the sale of counterfeit Tiffany items on eBay by participating in eBay's VeRO Program. (Zalewska Decl. ¶ 22.) Tiffany employees monitored eBay and submitted NOCIs to eBay for those listings that they had a good faith belief infringed on the TIFFANY Marks. (*Id.* at ¶ 35; Pl.'s Ex. 968.) Tiffany also requested that eBay provide Tiffany with contact information for the seller and that eBay suspend the seller for selling infringing items. (Cacucciolo Decl. ¶ 9.)

From the time of eBay's June 2003 letter through May 2004, Tiffany reported 46,252 listings for which Tiffany claimed a good-faith belief that the items being sold were counterfeit.[16] (Pl.'s Ex. 1082.) In August 2003, Tiffany was the second-highest reporter of NOCIs in the VeRO Program. (Def.'s Ex. 81; Pl.'s Ex. 92.) In each year from 2003 through 2006, Tiffany reported substantially more listings than it did the year prior. (Pl.'s Ex. 1082.) Specifically, Tiffany reported 20,915 listings in 2003 (*id.*); 45,242 listings in 2004 (*id.*); 59,012 listings in 2005 (*id.*); and 134,779 listings in 2006 (*id.*; Tr. 97:20-99:18). As of September 30, 2007, shortly before trial, Tiffany had reported 24,201 listings for 2007. (Zalewska Decl. ¶ 79.) All told, Tiffany reported 284,149 listings through the VeRO Program. (*Id.* at ¶ 80; Tr. 195:1-

195:8.) According to eBay's monthly records, of the 14,000 rights owners who participate in the VeRO Program, (Chesnut Decl. ¶ 17), Tiffany was among the top ten reporters in 21 of the 28 months between June 2003 and September 2005. (Pl.'s Ex. 253-283.) Thus, by any measure, it is clear that Tiffany was one of the most frequent reporters in the VeRO Program.

### 2. Tiffany's Staffing

Notwithstanding the significance of the online counterfeiting problem, it is clear that Tiffany invested relatively modest resources to combat the problem. In fiscal year 2003, Tiffany budgeted approximately $763,000 to the issue, representing less than 0.05 percent of its net sales for that year. (Def.'s Ex. 200; Tr. 94:11-14.) Tiffany's CEO, Michael Kowalski, testified that over the past five years, Tiffany has budgeted $14 million to anti-counterfeiting efforts — of which approximately $3-5 million was spent in litigating the instant action. (Tr. 825:121-826:21.)

More specifically, Tiffany's time dedicated to monitoring the eBay website and preparing NOCIs was limited. Beginning in the summer of 2003, Ewa Zalewska, then a paralegal in Tiffany's legal department, devoted two days a week to reviewing the eBay website and answering emails from buyers and sellers involving removed listings. (*Id.* at 76:7-77:4.) John Pollard, then Tiffany's security manager, also devoted one day a week to monitoring and reporting on the eBay website. (*Id.* at 78:7-10.) Between 2004 and 2006, anywhere from 172 to 240 man-hours per month were devoted to monitoring and reporting on the eBay

---

[16] These figures represent only listings; a single listing may have offered multiple Tiffany items, indicating that the number of potentially infringing items was likely higher than 46,252. (Zalewska Decl. ¶¶ 74, 80; *see* Def.'s Ex. 77 at 3.)

website, principally from paralegals, interns, Zalewska, Pollard, and a temporary employee. (Zalewska Decl. ¶ 67.) Translating these hours into a full-time equivalent employee, these hours reflected the equivalent of anywhere between 1.15 to 1.6 full-time employees per month dedicated to monitoring the eBay website. (Tr. 83:21-84:10.) In 2006, while the total number of hours dedicated to monitoring eBay did not change, Tiffany dedicated one full-time employee to patrolling eBay and reporting NOCIs through the VeRO Program. (*Id.* at 84:18-25; 188:1-3.) Moreover, in 2006, for the first time, Tiffany began to patrol eBay and report violations on a daily basis. (*Id.* at 188:1-3.)

While eBay suggested that Tiffany use technological tools, like Ranger Online, to facilitate reporting, Tiffany eventually rejected this technology. (*Id.* at 230:8-23; *see supra* at n.15.) Nor did Tiffany attempt to develop its own technology to expedite the process of monitoring and reporting on eBay. (*Id.* at 229:6-230:2.)

Given the limited technology and staff Tiffany chose to employ to pursue reporting through VeRO, the sheer volume of Tiffany items available on eBay made it difficult for Tiffany to comprehensively review all of the Tiffany listings on eBay. (*Id.* at 203:21-205:8.) On any given day, from early 2003 through 2006, a search for "Tiffany" and "silver" could return more than 1,000 results. (Zalewska Decl. ¶ 83.) With the limited resources that Tiffany was willing to devote to eBay review, Tiffany simply could not review every Tiffany listing. (Zalewska Decl. ¶ 83; Tr. 203:21-205:8.) In addition, when reviewing items on eBay, Tiffany's reviewers did not have the opportunity to see listings

any earlier than a member of the general public. Accordingly, potentially counterfeit merchandise could be listed and sold before Tiffany had even had the opportunity to review the listing. (Cacucciolo Decl. ¶ 47; Pl.'s Exs. 1075, 1077, 1078.) This was particularly true for listings over the weekends, when Tiffany's paralegals were not reviewing the website. (Zalewska Decl. ¶ 84.) It was also true for listings that had a "Buy It Now" option, which allowed a purchaser to bypass the auction process. (*Id.*; Cacucciolo Decl. ¶ 47; Pl.'s Exs. 1075, 1077, 1078.)

Thus, the record reflects that Tiffany could have invested additional resources in monitoring the eBay website and reporting NOCIs through the VeRO Program. Had Tiffany done so, Tiffany could have captured more of the infringing listings on eBay. (*Id.* at 624:24-626:20, 719:25-721:7; Chesnut Decl. ¶ 25.)

H. Evidence of Counterfeit Jewelry on eBay

It is clear that Tiffany was actively engaged in the filing of NOCIs to remove listings from eBay. However, a NOCI attests only to Tiffany's "good faith belief" that the listing infringes on Tiffany's trademark. A NOCI, alone, is not evidence that the listing itself was infringing. For that evidence, we turn elsewhere in the record.

1. The Buying Programs

In an effort to show that counterfeit jewelry was in fact being sold on eBay, Tiffany conducted a survey in 2004 to assess how many of the items offered under the Tiffany mark were, in fact, counterfeit. This pre-litigation survey and a second survey

conducted in 2005, after litigation commenced, are collectively known as the Buying Programs.

To design and implement the Buying Programs, Tiffany hired an independent survey expert, George Mantis. As per Mantis' recommendations, paralegals employed by Tiffany's outside counsel searched for jewelry on the eBay website using, *inter alia*, the keywords "Tiffany" and "sterling." (Mantis Decl. ¶ 8.) Using a random number generator, Tiffany then purchased a representative sample of the results of that search. During the 2004 Buying Program, Tiffany purchased 186 pieces of "Tiffany" silver jewelry. (Grasso Decl. ¶¶ 3, 33.) Tiffany's quality management personnel inspected and evaluated each of these items. (Callan Decl. ¶¶ 14, 17, 31.) They found that 136 items, or 73.1%, were counterfeit, and only 5% were genuine. (Grasso Decl. ¶; Mantis Decl. ¶ 20; Pl.'s Ex. 434.) They deemed the remaining 21.9% as potentially actionable, but did not determine that they were counterfeit. (Mantis Decl. ¶ 20; Pl.'s Ex. 434.) Tiffany reported these findings to eBay in its letter of June 10, 2004. (Pl.'s Ex. 492.)

In the spring of 2005, after this action was commenced, Tiffany repeated its survey, in order to determine whether the number of counterfeit items being listed on eBay continued to be predominantly counterfeit. (Grasso Decl. ¶¶ 35-36; Zalewska Decl. ¶ 66.) The results of the 2005 Buying Program were generally similar to the 2004 Buying Program. Tiffany determined that 75.5% of the 139 items purchased were counterfeit. (Mantis Decl. ¶ 20; Pl.'s Ex. 433.)

The Court finds that the Mantis surveys are of very limited probative value. First, the Court finds that the original design of the Buying Programs was flawed. Mantis conceded at trial that his original survey specification suffered from an inherent flaw, namely, that it would be impossible for all items to have a known, non-zero chance for selection, and thus that the sample was not a probability sample. (*Id*. at 300:10-14.) Because the Buying Programs were not probability samples, it is not possible to generalize or make any greater inference about the general population of the sampling study's universe from the data yielded in the Buying Programs. (Ericksen Decl. ¶ 68.) Moreover, without a probability sample, it is impossible to calculate a confidence interval in the data. (Tr. 553:16-554:10.)

Second, there were several errors in the implementation of the programs. Mantis did not himself conduct the Buying Programs; instead, Tiffany's counsel and quality assurance personnel conducted the program and authenticated the items. (Mantis Decl. ¶ 20.) Those who did implement the programs deviated in significant respects from Mantis's protocol. Indeed, at trial Mantis admitted that (1) the recommended sample size was not achieved (Tr. 297:8-25); (2) not all items selected through the program were actually purchased (*id.* at 297:19-25); (3) the 2004 program included the week before Valentine's Day, even though the protocol stated that the program should not take place during holiday periods (*id.* at 303:10-304:3); and (4) frequent mistakes were made in the steps that should have been followed in deciding which items to purchase (*id.* at 302:19-303:3).

Third, the universe of goods that were sampled through the Buying Programs were not representative of the universe of Tiffany silver jewelry at issue in this litigation. The search criteria used to identify those items that were then purchased through the program were not search criteria designed to identify the universe of Tiffany jewelry available on eBay. Instead, they were the same search terms that Tiffany used in its regular efforts to identify and report counterfeit items. (Tr. 282:20-24, 283:18-24, 284:6-12; Ericksen Decl. ¶¶ 33-35.) Additionally, in these search terms, Tiffany searched for "sterling" Tiffany, rather than the "silver" Tiffany that is at issue in this litigation.

Fourth, Tiffany suspended its routine VeRO reporting efforts when the Buying Programs were in effect. (Tr. 291:12-21; Ericksen Decl. ¶¶ 45-57.)

For these reasons, the Court finds that the Buying Programs provide limited evidence as to the total percentage of counterfeit goods available on eBay at any given time. (Tr. 289:19-291:2; Ericksen Decl. ¶ 57.) The Court's conclusion is consistent with Tiffany's concession that the results of the Buying Programs were not intended to be extrapolated to any day outside the specific dates of the programs. (Pl.'s Motion *In Limine* Opp. at 4; Tr. 278:19-25; 279:14-18.)

In addition, the Court finds that the Buying Programs provide no probative evidence on Tiffany's proposed five-or-more rule, because the search criteria for the Buying Programs did not include any parameter looking for "five or more" listings. (Tr. 282:13-17; Mantis Decl. ¶ 18.)

Nevertheless, notwithstanding these methodological flaws, even eBay's expert, Dr. Eugene Ericksen, conceded that a substantial amount of the "Tiffany" jewelry listed on eBay's website — 30% or more — could safely be deemed to be counterfeit. (Tr. 555:5-12.) Accordingly, despite the methodological limitations of Mantis' survey, the Court finds that a significant portion of the "Tiffany" sterling silver jewelry listed on the eBay website during the Buying Programs was counterfeit.[17]

## 2. Buyers Complained to eBay

At the same time that Tiffany was complaining to eBay about the sale of counterfeit goods, buyers were also complaining to eBay. (Pl.'s Ex. 493-645.) For example, during the last six weeks of 2004, 125 consumers complained to eBay about purchasing "Tiffany" items through the eBay website that they believed to be counterfeit. (*See* Pl.'s Ex. 493-645.)

At trial, three consumers submitted affidavits attesting that they purchased counterfeit goods on eBay from sellers who marketed those goods as new and genuine. (Badart Decl. ¶¶ 3-12; Byron Decl. ¶¶ 7-16; Lahood Decl. ¶¶ 4-8, 14.) These consumers all complained to eBay and/or PayPal. For instance, in November 2005, Elizabeth Badart purchased what she believed to be a genuine Tiffany bracelet and earrings set from an eBay seller. (Badart Decl. ¶ 7.) Once she received them, it was clear to her that the

---

[17] Of course, these figures offer no guidance as to what percentage of counterfeit listings would have been captured, and removed, via diligent use of the VeRO Program, which, as noted, was suspended by Tiffany during each of the Buying Programs.

"Tiffany" items were fake. (*Id.* at ¶ 11.) Badart complained to PayPal on November 8, 2005. After repeated communications with PayPal for the next month, PayPal sent Badart a refund. (*Id.* at ¶¶ 14-20.)

When Tiffany became aware of these three individuals, Tiffany offered to authenticate the items they had purchased. All three were subsequently determined to be counterfeit. (*Id.* at ¶¶ 11-12; Byron Decl. ¶ 20; Lahood Decl. ¶ 14.)

### 3. Buyers Complained to Tiffany

Tiffany also received complaints about counterfeit Tiffany items sold on eBay. Between April 2003 and October 2007, Tiffany's Customer Service Department received over 3,900 emails complaining about counterfeit "Tiffany" items on eBay. (Lange Decl. ¶ 1.) The majority of the emails included questions about whether the product was fake, and whether Tiffany was aware of the problem. (*Id.* at ¶¶ 1, 3.) Some customers faulted Tiffany for failing to police the eBay website for counterfeit merchandise. (*Id.* at ¶ 3; Pl.'s Exs. 888, 901.) Four of these complaints concerned sellers whom Tiffany had previously reported to eBay by filing a NOCI. (*Compare* Pl.'s Exs. 497, 511, 572, and 625 *with* Pl.'s Ex. 1067 at 3-4, 8, 14.)

In addition, some buyers went to Tiffany seeking a letter or statement confirming that the item was a counterfeit. (Pl.'s Exs. 844, 847, 848, 859.) Such proof was required by eBay in order for the buyer to qualify for the buyer protection program. (Pl.'s Ex. 1146.) However, Tiffany does not authenticate jewelry unless items were purchased from Tiffany directly. (Lange Decl. ¶ 9.)

### 4. Authentic Tiffany Jewelry Is Sold on eBay

While the Court concludes that counterfeit Tiffany jewelry was listed and sold on eBay, it is also clear that genuine Tiffany silver jewelry was also sold on eBay. Even with their methodological flaws, the Mantis Buying Programs found that approximately one quarter of the items were either authentic or could not be determined to be counterfeit. This conclusion is all the more striking because, as discussed *supra*, the search parameters for the Buying Programs were designed to seek out *counterfeit* jewelry. In addition, genuine silver jewelry was, on occasion, sold in lots of 5 or more items. (*See, e.g.*, Def.'s Ex. 422 (showing that eBay user "30plus20" sold dozens of authentic silver jewelry items on eBay.)) Finally, Tiffany has occasionally reported items in NOCIs, only to be proved wrong and have eBay reinstate the listings. (*See, e.g.*, Def.'s Exs. 34, 270.)

### I. eBay's Response to Tiffany's NOCIs

### 1. eBay Removed Listings

As noted in Section II.C.4.c, once Tiffany notified eBay through a NOCI of a listing it believed to contain infringing merchandise, eBay removed that listing from its website through its VeRO Program, advised the sellers and the bidders that the listing had been removed, provided the reason for the removal as well as educational material to the seller, and refunded all fees associated with the transaction. (Zalewska Decl. ¶ 43.) Indeed, Tiffany's own witnesses stated — and the evidence at trial demonstrated — that eBay never refused to remove a reported

Tiffany listing,[18] acted in good faith in responding to Tiffany's NOCIs,[19] and always provided Tiffany with the seller's contact information.[20] (Tr. 112:2-7, 146:10-14, 266:2-267:2, 814:18-22.)[21]

Tiffany has publicly stated that the VeRO Program has been successful. In a 2004 article written by John Pollard and David McGowan, then vice president of worldwide security services for Tiffany and Co., the authors stated that by using the VeRO Program, Tiffany was successfully able to reduce the number of potentially counterfeit Tiffany items on eBay. (Def.'s Ex. 196.)

Moreover, in pre-litigation communications with eBay buyers and sellers, Tiffany praised eBay for its willingness to remove listings at Tiffany's request. (Def.'s Ex. 185 ("We have worked with e-Bay for quite some time. They allow us to determine whether an auction infringes on our trademark. They will not allow an item to be re-listed if we say not to.").)

Finally, of all the conditions set forth in Tiffany's June 2004 demand letter, eBay acquiesced to all but two — namely, Tiffany's request that eBay ban all listings containing five or more items as presumptively infringing, and Tiffany's demand that eBay prohibit the sale of Tiffany silver altogether. (Pl.'s Exs. 489, 491). Accordingly, despite Tiffany's unsupported assertion that eBay failed to remove listings after a NOCI was filed, the Court finds that eBay always removed listings promptly upon the receipt of a NOCI.

## 2. eBay Suspended Sellers

When Tiffany filed a NOCI, Tiffany often requested that eBay suspend the seller. Indeed, by 2005, Tiffany's NOCIs routinely included a request that eBay suspend the seller.[22] (Cacucciolo Decl. ¶¶ 9, 24, 25, 48.)

---

[18] When asked, "[H]ow many times has eBay ever, to use your word, refused to take down a listing as requested by Tiffany, ever in your experience?", Zalewska responded, "In my experience, none." (Tr. 112:2-5.) Kowalski likewise testified that in virtually all cases eBay took down the listings for any auctions that were identified by Tiffany as potentially infringing. (*Id*. at 814:18-22.)

[19] When later asked if she ever doubted eBay's good faith, Zalewska stated, "No." (*Id*. at 113:2-3.)

[20] Zalewska testified that eBay cooperated in providing seller information, and never failed to fully and completely provide, to the extent eBay was able, seller contact information. (Tr. 266:2-267:2.)

[21] Tiffany's sole documentary evidence in support of the allegation that eBay refused to remove listings after NOCIs were filed took the form of fifteen requests to eBay, all dated just two weeks before the parties' joint pretrial order was due. (Pl.'s Ex. 1120-34.) However, in all fifteen instances, the offending listings were actually taken down either before or within a day of eBay's receipt of the original notice of infringement, before a follow-up request was sent. (Tr. 726:10-727:6, 727:14-728:10.) Moreover, on examination, it is clear that none of the follow-up requests actually claimed that the listing had not in fact been removed. Instead, the follow-up emails requested contact information for the seller. (*See, e.g.*, Pl.'s Ex. 1120 at 2, 4.)

[22] Although Tiffany routinely sought and received contact information for sellers of listings that were the subject of NOCIs, it is undisputed that Tiffany brought no actions for direct infringement against any of these sellers after Tiffany's May 2003 demand letter. This is true even with respect to the repeat offenders that Tiffany identified and the sellers of counterfeit items identified by the Buying Programs. Although Tiffany is not "required to constantly monitor every nook and cranny of the entire nation and to fire both barrels of [its] shotgun instantly upon spotting a possible infringer," *Cullman Ventures, Inc. v. Columbian Art*

The Court finds that eBay declined to automatically or permanently suspend a seller after the filing of a first, or even a second, NOCI. However, for the following reasons, the Court finds that eBay took appropriate steps to warn and then to suspend sellers when eBay learned of potential trademark infringement under that seller's account.

eBay suspended "hundreds of thousands of sellers every year," tens of thousands of whom were suspended for having engaged in infringing conduct. (Tr. 707:8-708:23; Chesnut Decl. ¶ 51; Def.'s Exs. 27, 100, 134.) Although eBay primarily employed a "three-strikes rule" for suspensions, a seller could be suspended on a first violation if it were determined that, for example, the seller "listed a number of infringing items," and "this appears to be the only thing they've come to eBay to do." (Tr. 700:10-22, 589:25-291:6; Chesnut Decl. ¶¶ 48-49.) In other circumstances, if a seller listed a potentially infringing item but appeared overall to be a legitimate seller, the "infringing items [were] taken down, and the seller [would] be sent a warning on the first offense and given the educational information, [and] told that . . . if they do this again, they will be suspended from eBay." (Tr. 700:23-701:10.)

---

*works, Inc.*, 717 F. Supp. 96, 126-27 (S.D.N.Y. 1989), it seems likely that aggressive pursuit of direct infringement actions against the sellers of counterfeit goods might have had a significant deterrent effect on potential future infringers on eBay and other websites. Moreover, while "[l]awyers and lawsuits come high and a financial decision must be made in every case as to whether the gain of prosecution is worth the candle," *id.*, the record at trial reflects that Tiffany gave scant consideration to contingent or other fee arrangements that might have enabled Tiffany to retain counsel to pursue infringement activity against sellers with minimal upfront cost. (Tr. 802:5-806:13.)

The Court finds that eBay's refusal to use a hard-and-fast, one-strike rule was appropriate for several reasons. First, although a NOCI represented a good-faith belief that a listing was infringing, a NOCI did not constitute a definitive finding that the listed item was counterfeit. (*Id*. at 704:23-705:2.) Indeed, on occasion, Tiffany acknowledged that items that had been the subject of a NOCI were in fact genuine and subsequently requested that items be reinstated. (*See* Def.'s Exs. 34, 270, 422.) In light of eBay's User Agreement, which prohibited sellers from selling infringing items, as well as eBay's policy of cancelling the listing, warning the seller and buyer of the possible infringement, and referring the seller to Tiffany's "About Me" page, it was not unreasonable for eBay to conclude that sellers should not be automatically suspended upon the filing of a single NOCI.

Second, as noted by Chesnut, a suspension was a very serious matter, particularly to those sellers who relied on eBay for their livelihoods. (Tr. 705:3-6.) The Court credits eBay's concern that an automatic suspension was inappropriate for those sellers who might have been innocent infringers, might have believed that the merchandise posted on their listings was authentic, or might have believed that posting counterfeit Tiffany items was not illegal. (*Id*. at 704:18-705:16; *see also id*. at 705:17-706:9; Chesnut Decl. ¶¶ 47, 50-51; Def.'s Exs. 15, 27, 100.)

The evidence at trial demonstrates that, despite the fact that eBay did not immediately suspend sellers upon the receipt of a NOCI, eBay's policy was appropriate and effective in preventing sellers from returning to eBay and

re-listing potentially counterfeit merchandise. Out of the 284,149 listings reported since 2003, Tiffany offered proof of only twenty-three instances in which a seller previously reported through VeRO reappeared on eBay under the same user name.[23] One of these sellers was a PowerSeller.[24] On other occasions, eBay sellers who had previously been reported through a NOCI reappeared on the website using a different user name. Tiffany purports to have identified 178 individuals who used a variety of different user names to return to eBay to sell allegedly counterfeit goods. Plaintiff's Exhibit 1067 is a summary chart which identifies these individuals and provides the assorted user names that were used as well as the dates on which Tiffany filed a NOCI regarding the sellers' infringing listings.[25] (Zalewska Decl. ¶ 97.) Using different user names, seventeen of the sellers appear on the chart five or more times, reflecting that despite Tiffany's NOCIs, these seventeen sellers were able to return to eBay to list potentially counterfeit goods. (Pl.'s Ex. 1067.) However, no further testimony or evidence concerning these sellers was introduced at trial. Nevertheless, the vast majority of the sellers on the chart appear no more than twice, indicating that after Tiffany filed two NOCIs reporting these sellers, the sellers no longer reappeared on eBay. (Id.) More importantly, with respect to both of these groups of sellers — who together comprise a small percentage of the 284,149 listings that were reported by Tiffany — eBay never refused to take down the listings upon the receipt of a NOCI. (Tr. 112:2-7, 146:10-14, 814:18-22.)

Finally, the Court notes that Tiffany did not present evidence or argue that any of the counterfeit items purchased in the Buying Programs — in short, the items in the record that are demonstrably counterfeit, as opposed

---

[23] At trial, Tiffany specifically identified three sellers who reappeared under the same user name was "annag9," "tracycwazy," and "Freshhunter." With respect to these sellers, the evidence demonstrates that once a Tiffany representative saw the infringing listings and filed a NOCI, eBay immediately removed the listings. (Zalewska Decl. ¶¶ 89-93; Tr. 149:25-150:3.) When the seller subsequently reappeared on eBay and a Tiffany representative filed a second NOCI, eBay again immediately removed the listings. (Id.) The evidence does not demonstrate that a third NOCI was ever filed with respect to these users, nor does it demonstrate that eBay ever refused to remove the allegedly infringing listings. The evidence with respect to the remaining "repeat offenders" is less detailed. For example, at least one of the exhibits cited in support of this contention was not a request that listings be taken down, but rather a request that eBay send Tiffany the seller's contact information. (See Pl.'s Ex. 805.) With respect to the remaining sellers, Tiffany offered no evidence of the first NOCI filing and little to no proof of the amount of time that had elapsed between Tiffany's first and second notifications to eBay. (See, e.g., Pl.'s Exs. 813, 811.)

[24] The evidence shows that one of the sellers who re-listed items under the same user name was "the firstman_vip." (Pl.'s Ex. 1077; Cacucciolo Decl. ¶ 41; Tr. 509:18-512:5.) This user was a PowerSeller. However, the evidence does not show that this PowerSeller, or any other PowerSeller, was treated differently by eBay than any other seller of infringing items. Indeed, there is no evidence that upon the receipt of a NOCI concerning this PowerSeller, eBay failed to immediately remove the listings.

[25] With respect to some of the entries, the probative value of the chart is limited because it is not possible to discern how long it took eBay to respond to the listings and over what period the sellers were selling potentially infringing listings. Seventeen of the entries also appear to count a seller as having "reappeared" even though the seller's second set of potentially infringing listings were reported on the same date as the first. (Id.; Tr. 161:6-9.) Moreover, twenty of the entries fail to indicate the date on which Tiffany reported the seller. (Id.)

to being merely suspicious — were sold by sellers who had previously been the subject of a NOCI filed by Tiffany. The Court observes that "annag9," a repeat seller, did sell an item that was purchased through the Buying Programs and was determined to be counterfeit. However, that purchase was made on April 6, 2005, well before Tiffany filed a NOCI against any listings placed by "annag9." The evidence does not demonstrate that Tiffany ever forwarded the identities of these known counterfeiters to eBay prior to the commencement of litigation.

In short, the Court finds that while eBay did not immediately suspend sellers upon the filing of a NOCI, the evidence does not show that alleged counterfeiters could return with impunity to sell counterfeit Tiffany products on eBay. Nor does the evidence establish that eBay encouraged sellers whose listings were previously removed following the filing of a NOCI to simply re-list their previously removed items, or to return to eBay to list other counterfeit items. Accordingly, the Court concludes that Tiffany has failed to prove that eBay continued to supply its service to sellers whom eBay knew to be selling actual counterfeits.

### 3. eBay Took Additional Steps to Stop the Sale of Counterfeit Tiffany Goods

Finally, eBay took additional steps to respond to the allegations of counterfeit Tiffany items on its website. First, subject to some constraints, beginning in 2003 or early 2004, eBay used special warning messages when a seller attempted to list a Tiffany item. (Chesnut Decl. ¶¶ 54-55; Tr. 750:16-752:21.) These warning messages instructed the seller to make sure that the item was authentic

Tiffany merchandise and informed the seller that eBay "does not tolerate the listing of replica, counterfeit, or otherwise unauthorized items" and that violation of this policy "could result in suspension of [the seller's] account." (Def.'s Ex. 136.) The warning message also provided a link to the Tiffany "About Me" Page. If the seller continued to list an item despite the warning, the listing was flagged for review. (Chesnut Decl. ¶ 55.)

Second, eBay periodically conducted reviews of listings in an effort to remove those that might be selling counterfeit goods, including Tiffany goods. (Tr. 597:20-25.) Specifically, because Tiffany had reported many potentially infringing listings, eBay conducted a "clean-up" effort of the Tiffany listings. (Id. at 745:9-20.) As part of this effort, members of eBay's infringement group focused on Tiffany listings and, using their best judgment, searched the website manually to find counterfeit listings. (Id. at 744:11-24.) As a result of these "clean-up" efforts, numerous listings were removed and a number of sellers were suspended. (Id. at 597:20-25, 744:11-24; see also Def.'s Exs. 81, 93.)

Third, eBay implemented Tiffany-specific filters in its fraud engine. (Tr. 664:2-22; Def.'s Ex. 125.) eBay employed numerous rules specifically pertaining to Tiffany and more than 50 other key brand names. (Chesnut Decl. ¶ 37.) At the time that Tiffany filed the present litigation, eBay's rules searched for approximately 90 different keywords regarding Tiffany merchandise offered for sale by third parties on eBay. (Id.) For example, the system searched for terms in listings such as "counterfeit tiffany," "faux

tiffany," "tiffany style," and "inspired by tiffany." (*Id*.)

## J.  Use of Technology to Further Prevent Listings of Counterfeit Tiffany Merchandise

Tiffany's expert witness, Dr. Gregory Piatetsky-Shapiro — an expert in the field of data mining — testified that eBay could have done more, at an earlier time, to screen out potentially counterfeit Tiffany merchandise from its website.  (Piatetsky-Shapiro Decl. ¶ 7.)  Specifically, he testified that, using data mining techniques commonly used by corporations, eBay could have designed programs that identified listings of Tiffany items likely to be counterfeit, and that identified the sellers thereof, using an algorithm to produce a "suspiciousness" score. (Piatetsky-Shapiro Decl. ¶¶ 14, 26-29; Tr. 357:3-357:15.)  He testified that eBay could more effectively have managed counterfeit goods on its website by addressing sellers, rather than listings (Tr. 357:3-357:15).

Nevertheless, Dr. Piatetsky-Shapiro conceded that his work was based on a snapshot of the eBay system and did not reflect the extent to which eBay could implement these measures on a real-time basis, taking into account the millions of eBay listings and the needs of other rights holders. (*Id*. at 349:20-1.)  Dr. Piatetsky-Shapiro also conceded that implementing system-wide changes on a real-time basis would place a greater strain on eBay's hardware resources (*id*. at 350:16-19), and that he did not know the impact on eBay's systems that would result from implementing the measures he proposed, (*id*. at 351:6-352:4.)

To the extent that Dr. Piatetsky-Shapiro testified that eBay should use an algorithm to identify suspicious sellers on eBay, Dr. Piatetsky-Shapiro conceded that his methodology would not be able to actually identify counterfeit Tiffany items on eBay. (*Id*. at 322:16-21, 323:20-21, 330:15-20, 326:6-19, 328:18, 376:11.)  His methodology simply used criteria to search for sellers he deemed to be suspicious – the definition of "suspicious" being largely subjective and circular, based, at least in part, on the criteria previously used by Tiffany, including the fact that the seller listed five or more Tiffany items. (*Id*. at 333:16-25.)  He further admitted that his methodology might easily be circumvented over time because counterfeiters typically adapt to evade such anti-counterfeiting measures.  Finally, Dr. Piatetsky-Shapiro conceded that Tiffany itself had the ability to use his algorithm just as well as eBay, and that Tiffany never sought to use the algorithm to identify potential counterfeit goods which it could then report to eBay through the VeRO Program.  (*Id*. at 352:19-353:1, 366:12-16, 367:9-19, 366:3-9.)

In any event, by late 2006, eBay adopted several new measures to prevent fraud.  First, eBay began to delay the ability of buyers to view listings that used certain brand names, including Tiffany, for 6 to 12 hours in order to enable CSRs to manually review those listings.  (*Id*. at 655:23-656:14.)  Second, eBay developed the capacity to automatically assess the number of items offered in a given listing.  Finally, eBay began to prohibit one-day and three-day auctions of certain brand name items, and restricted cross-border trading — particularly important, given the quantity of counterfeit merchandise that

appeared to come from outside the United States. (Pl.'s Ex. 1218.)

Nevertheless, the evidence introduced at trial demonstrated that while eBay had the capacity as early as 2004 to implement some of these measures in isolation — including the ability to delay listings for Tiffany silver jewelry in order to give eBay's customer service representatives time to review and screen them (Tr. 665:4-665:11), and to implement quantity filters that flagged listings offering multiple items of Tiffany silver jewelry (*id.* at 659:10-659:13) — eBay could not feasibly have implemented all of these measures collectively at an earlier time. Specifically, the evidence does not demonstrate that eBay could have implemented these measures in combination with other initiatives such that the overall set of anti-fraud efforts would work successfully. (*Id.* at 657:16-17 (eBay lacked the capability to impose quantity limits on listings of Tiffany items); *id.* at 665:12-666:12 (until recently, when a listing was flagged, the system could not generate the data to allow customer service representatives to review the seller's other listings); *id.* at 738:24-740:20 (each measure needed to be implemented in conjunction with other measures in order to be effective); *id.* at 662:24-663:11 (would not have been possible for more preemptive measures to be implemented for all rights owners).)

Accordingly, the Court concludes that Tiffany failed to prove that eBay acted unreasonably by not implementing anti-fraud measures before 2006. To the contrary, the record is clear that eBay consistently took steps to improve its technology and develop anti-fraud measures as such measures became

technologically feasible and reasonably available.

## III. CONCLUSIONS OF LAW

Tiffany has alleged multiple causes of action in this lawsuit, including (1) direct trademark infringement under federal and common law; (2) contributory trademark infringement under federal and common law; (3) unfair competition under federal and common law; (4) false advertising under section 43(a)(1)(B) of the Lanham Act; (5) trademark dilution under federal and New York law; and (6) contributory dilution. The Court will briefly summarize its jurisdiction over this matter and identify the burden of proof for each cause of action. The Court will then discuss each cause of action in turn.

### A. Jurisdiction

The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338, as well as 15 U.S.C. § 1121(a). The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a). Venue in the Southern District is proper under 28 U.S.C. § 1391.

### B. Burden of Proof

The party making the allegations of infringement — here, Tiffany — has the burden of proof to present evidence in support of the allegations set forth in its complaint and to prove those allegations by a preponderance of the evidence. *See Merit Diamond Corp. v. Suberi Bros., Inc.*, No. 94 Civ. 4572 (SHS), 1996 WL 11192, at *2 (S.D.N.Y. Jan. 11, 1996) (holding that trademark infringement must be demonstrated "by a preponderance of

the credible evidence"); *McGraw-Hill, Inc. v. Comstock Partners, Inc.*, 743 F. Supp. 1029, 1036 (S.D.N.Y. 1990) (plaintiff must establish "by a preponderance of the evidence that its trademark has been infringed by any of the defendants"); *see also Savin Corp. v. Savin Group*, 391 F.3d 439, 449 (2d Cir. 2004) ("plaintiff must show a preponderance of the evidence on each element of a claimed violation" of federal dilution act). "'The burden of showing something by a preponderance of evidence . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'" *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) (quoting *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993)).

### C. Direct Trademark Infringement under Federal and Common Law

Tiffany sues defendants for direct trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1);[26] Section 34(d) of the Lanham Act,

---

[26] The statute provides, in pertinent part, that:

Any person who shall, without the consent of the registrant — (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1)(a).

15 U.S.C. § 1116(d); and New York state common law. Under Section 32(1) of the Lanham Act, "the owner of a mark registered with the Patent and Trademark Office can bring a civil action against a person alleged to have used the mark without the owner's consent." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 146 (2d Cir. 2007). Under Section 34(d), a court may grant an order authorizing the seizure of goods and counterfeit marks involved in such violation. *See* 15 U.S.C. § 1116(d)(1)(A). Finally, "under New York state law, a mark owner may maintain a statutory or common law action against a party who engages in unauthorized use of the mark." *ITC Ltd.*, 482 F.3d at 146; *see also* N.Y. Gen. Bus. Law § 360-k (McKinney 2006) (protecting registered marks). The elements required to prevail on trademark infringement and unfair competition claims under New York common law mirror the Lanham Act claims for trademark infringement and unfair competition. *See Standard & Poor's Corp. v. Commodity Exch., Inc.*, 683 F.2d 704, 708 (2d Cir. 1982); *TCPIP Holding Co. v. Haar Comm'cns., Inc.*, No. 99 Civ. 1825 (RCC), 2004 WL 1620950, at *6 n.5 (S.D.N.Y. July 19, 2004); *Twentieth Century Fox Film Corp. v. Marvel Enter., Inc.*, 220 F. Supp. 2d 289, 297-98 (S.D.N.Y. 2002). Accordingly, the Court will address Tiffany's state and federal claims for direct trademark infringement together.

Tiffany argues that eBay has directly infringed its trademark in three ways. First, Tiffany contends that eBay has directly infringed its trademarks by advertising the availability of Tiffany jewelry on eBay, by using the Tiffany name on the eBay home page and in eBay documents and publications, and by subsequently deriving revenue from

the sale of that jewelry on its website. Specifically, Tiffany submits that eBay (1) has advertised the sale of Tiffany jewelry on its home page; (2) has advertised to its sellers and buyers alike that "Tiffany" and "Tiffany & Co." are two of the top search terms in the Jewelry and Watch category; (3) has provided lists of popular brand names, including "Tiffany," on its website that, when clicked on, bring a user directly to the listings offering Tiffany merchandise; and (4) has provided potential buyers with links to other listings posted by that seller, including links for a seller's offering of "Tiffany" merchandise. (*See* Pl.'s Pretrial Mem. at 26-27.) Tiffany contends that eBay profits from this activity by taking a listing fee and a percentage of the sales price of each item of Tiffany jewelry sold on its venue. (*Id.*)

Second, Tiffany submits that eBay has purchased "sponsored links" on Google and Yahoo! advertising eBay listings that offer Tiffany jewelry for sale. (*Id.*) Like Tiffany's claims against eBay for using the Tiffany name on its homepage, these claims are predicated on eBay's advertising efforts. Unlike the use of the Tiffany name on eBay's homepage, however, these sponsored links appear on outside search engines, rather than eBay's website itself.

Third, Tiffany makes the broader argument that eBay should be held liable for direct trademark infringement, "just as an officer or employee of a store selling infringing merchandise is jointly and severally liable with the store for that infringing sale." (Pl.'s Pretrial Mem. at 27.) This claim rests on eBay's alleged participation in the sales of counterfeit merchandise on the eBay website.

In response, eBay raises the defense of nominative fair use, arguing that it is "entitled to inform third parties of the availability of listings of Tiffany merchandise on its website." (Def.'s Post-Trial Mem. at 39.) eBay further argues that because eBay does not directly sell the counterfeit merchandise to buyers, there can be no joint or several liability for direct infringement under Tiffany's theory. (Def.'s Post-Trial Mem. at 42-43.) For the reasons that follow, the Court concludes that eBay's use of the TIFFANY Marks is a protected, nominative fair use, and thus finds in favor of eBay with respect to the claims for direct trademark infringement.

1. Elements of Direct Infringement Under Federal and State Law

In order to prevail on a trademark infringement claim, a plaintiff must establish that "(1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) 'in connection with the sale . . . or advertising of goods or services,' (5) without the plaintiff's consent." *1-800 Contacts, Inc. v. WhenU.com, Inc.*, 414 F.3d 400, 406-07 (2d Cir. 2005) (quoting 15 U.S.C. § 1114(1)(a)); *see also Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 117 (2d Cir. 1999); *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 742 (2d Cir. 1998); *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997). In addition, "the plaintiff must show that defendant's use of that mark 'is likely to cause confusion . . . as to the affiliation, connection, or association of [defendant] with [plaintiff], or as to the origin, sponsorship, or approval of [the defendant's] goods, services, or commercial activities by [plaintiff].'"

*1-800 Contacts, Inc.*, 414 F.3d at 406-07 (quoting 15 U.S.C. § 1125(a)(1)(A)); *see also Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1508-09 (2d Cir. 1997); *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993).

Courts often summarize this analysis in a two-pronged test. The test asks first whether the plaintiff's mark is valid and entitled to protection, and second whether the defendant's use of the mark is likely to cause confusion as to the origin of the goods. *See Savin*, 391 F.3d at 456 (describing a two-prong test for trademark infringement); *Virgin Enters. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003). For the purpose of this trial, no dispute exists as to the first prong: eBay has stipulated to Tiffany's registration of its marks, and there is no question but that the TIFFANY Marks are famous. Therefore, the TIFFANY Marks are plainly valid and entitled to protection. The Court thus turns to the second prong of the test and, in particular, the defense of nominative fair use raised by eBay.[27]

## 2. Analysis

### a. eBay's Use of the TIFFANY Marks on its Homepage

Tiffany argues that eBay has used Tiffany's marks by advertising the availability of Tiffany items on the website in several ways — on the eBay home page, through communications with sellers and buyers, and through lists of top search terms and popular brand names. (*See* Pl.'s Pretrial Mem. at 26-27.) In response, eBay submits that such use does not constitute direct trademark infringement under the Lanham Act because it is protected by the doctrine of nominative fair use. (Def.'s Post-Trial Mem. at 39.) Even assuming *arguendo* that eBay's use meets the second prong of the test for direct infringement, the Court concludes that eBay's use of the mark is protected by the doctrine of nominative fair use.

Under trademark law, trademark owners cannot prevent others from making a descriptive use of their trademark. "While a trademark conveys an exclusive right to the use of a mark in commerce in the area reserved, that right generally does not prevent one who trades a branded product from accurately describing it by its brand name, so long as the trader does not create confusion by implying an affiliation with the owner of the product." *Dow Jones*, 451 F.3d at 308. This type of descriptive use of a trademark is protected under the doctrine of nominative fair use. *See Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 413 (S.D.N.Y. 2006), *reconsideration denied*, 431 F. Supp. 2d 425 (S.D.N.Y. 2006). "Such nominative use of a mark — where the only word reasonably available to describe a

---

[27] There is some dispute about whether "nominative fair use" is properly characterized as an affirmative defense or as a substitute for the "likelihood of confusion" inquiry (which itself is included in the second prong of the Second Circuit's two-pronged test). *Compare Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 217-224 (3d Cir. 2005) (holding that nominative fair use is an affirmative defense to a *prima facie* case of likelihood of confusion, similar to the fair use defense), *with Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 806 (9th Cir. 2002) (holding that an assertion of nominative use gives rise to a modified likelihood of confusion analysis). The Court need not choose between these two approaches, as the outcome would be the same under either analytical framework.

particular thing is pressed into service — lies outside the strictures of trademark law." *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992) (emphasis omitted). This doctrine is essential because it is undisputed that trademark owners cannot use trademark law to prevent the resale of authentic, trademarked goods. *See, e.g., Polymer Tech. Corp.*, 975 F.2d at 61-62 ("As a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner."); *Kitty Walk Sys., Inc. v. Midnight Pass Inc.*, 460 F. Supp. 2d 405, 407 (E.D.N.Y. 2006) (stating that resale of authentic goods "is neither trademark infringement nor unfair competition").[28]

Under the doctrine of nominative fair use, "[a] defendant may use a plaintiff's trademark to identify the plaintiff's goods so long as there is no likelihood of confusion about the source of defendant's product or the mark-holder's sponsorship or affiliation." *Merck & Co.*, 425 F. Supp. 2d at 413; *see Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 73 (2d Cir. 1999); 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:11 (4th ed. 2007). The nominative fair use defense is proven when: "'[f]irst, the product or service in question must be one not readily identifiable without use of the trademark;

second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.'" *New Kids on the Block*, 971 F.2d at 308; *see also EMI Catalogue Pshp. v. Hill, Holliday, Connors, Cosmopulos Inc.*, No. 99-7922, 2000 U.S. App. LEXIS 30761, at *21 (2d Cir. Sept. 15, 2000) ("Where a mark incorporates a term that is the only reasonably available means of describing a characteristic of another's goods, the other's use of that term in a descriptive sense is usually protected by the fair use doctrine.") (citing *New Kids on the Block*, 971 F.2d at 308); *cf. Nihon Keizai Shimbun, Inc.*, 166 F.3d at 73 (noting that where "it will usually be impossible to identify the source of the factual information without using a registered trademark of the source," the use of the trademark is protected).

The Court concludes that eBay's use of the TIFFANY Marks was protected under the nominative fair use doctrine. First, eBay demonstrated that the product in question — here, Tiffany silver jewelry — was not readily identifiable without the use of the Tiffany trademark. *See Playboy Enters. v. Welles*, 279 F.3d 796, 802 (9th Cir. 2002) ("This situation arises when a 'trademark also describes a person, a place or an attribute of a product' and there is no descriptive substitute for the trademark.") (quoting *New Kids on the Block*, 971 F.2d at 308). The record has made such a finding eminently clear; the Tiffany name is what gives the jewelry the cachet it enjoys. Absent the Tiffany brand, a silver heart necklace or a silver bracelet with an ID chain would simply be a piece of jewelry,

---

[28] The doctrine has been implicitly recognized by the Second Circuit, *see Dow Jones*, 451 F.3d at 308; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 156 (2d Cir. 2002), and applied by several district courts in this Circuit, *see, e.g., S&L Vitamins, Inc. v. Australian Gold, Inc.*, 521 F. Supp. 2d 188 (E.D.N.Y. 2007); *Merck & Co.*, 425 F. Supp. 2d at 413; *Nasdaq Stock Mkt., Inc. v. Archipelago Holdings, LLC*, 336 F. Supp. 2d 294 (S.D.N.Y. 2004).

instead of a symbol of luxury. Indeed, were eBay precluded from using the term "Tiffany" to describe Tiffany jewelry, eBay would be forced into absurd circumlocutions. To identify Tiffany jewelry without using the term Tiffany — perhaps by describing it as "silver jewelry from a prestigious New York company where Audrey Hepburn once liked to breakfast," or "jewelry bearing the same name as a 1980s pop star" — would be both impractical and ineffectual in identifying the type of silver jewelry available on eBay. Accordingly, the Court finds that the product or service in question is not readily identifiable without use of the TIFFANY Marks.

Second, eBay has demonstrated that it used only so much of the mark or marks as was reasonably necessary to identify the product or service. *See New Kids on the Block*, 971 F.2d at 308. In *Playboy Enterprises v. Welles*, the court found that the defendant's use of the trademarked word "Playboy," without the font or symbols — *e.g.*, the famous Playboy bunny — associated with the trademark, constituted fair use because the use was limited to what was reasonably necessary and no more. 279 F.3d at 802. In the instant case, eBay's use of the TIFFANY Marks on its website and in its communications to eBay buyers and sellers is similarly limited to the Tiffany name. (*See, e.g.*, Pl.'s Exs. 1158, 1159, 1160, 1161, 1164.) eBay has thus met its burden on this element of the *New Kids* test.

Finally, eBay has shown that it did not do anything that would suggest sponsorship or endorsement by the trademark holder. *See New Kids on the Block*, 971 F.2d at 308. Clearly, "a use is not nominative if it creates a likelihood of confusion about the mark-holder's affiliation or sponsorship." *Chambers v. Time Warner*, No. 00 Civ. 2839 (JSR), 2003 U.S. Dist. LEXIS 3065, at *10 (S.D.N.Y. Mar. 5, 2003); *see also Dow Jones*, 451 F.3d at 308 n.14; *Courtenay Commc'ns. Corp. v. Hall*, 334 F.3d 210, 214 (2d Cir. 2003); *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 546 (5th Cir. 1998). However, the mere use of a trademarked term to describe something is not enough to suggest sponsorship or endorsement. *See Cairns*, 292 F.3d at 1155 (holding that even without explicit disclaimer, no endorsement or sponsorship was suggested when there was no evidence in the record that rights holders were associated with the alleged infringers); *Playboy Enters*., 279 F.3d at 803 (holding that "it would be unreasonable to assume that [Playboy] currently sponsors or endorses someone who describes herself as a 'Playboy Playmate of the Year in 1981,'" especially where website included explicit disclaimer); *Merck & Co.*, 425 F. Supp. 2d at 414 (holding that there is nothing improper about the use of a trademark to communicate that goods bearing that mark were actually sold on defendant's website); *cf. Courtenay Commc'ns Corp.*, 334 F.3d at 214 (holding that use of trademarked term on website in a way that created the impression that the trademarked organization had endorsed defendants' services was not protected).

Under these principles, the Court concludes that eBay's use of the TIFFANY Marks on its website did not create the impression that Tiffany had affiliated itself with, sponsored, or endorsed the sale of Tiffany items on eBay. Unlike the website owner in *Courtenay*, eBay did not use TIFFANY's Marks in such a way as to

suggest that Tiffany endorsed eBay or was an affiliate of eBay. At most, the use of the TIFFANY Marks suggested that individual eBay sellers were selling authentic Tiffany merchandise on eBay. Given the Court's finding that authentic Tiffany merchandise was sold, quite legally, through eBay, and given the Court's finding that eBay always removed potentially infringing listings when Tiffany filed a NOCI, the Court cannot conclude that eBay's use of the TIFFANY Marks created the impression of sponsorship or endorsement by the trademark owner. *See Merck & Co.,* 425 F. Supp. 2d at 414. As the Supreme Court has long held, when a "mark is used in a way that does not deceive the public," there is "no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo." *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368 (1924).

Moreover, there is scant evidence to suggest that eBay's use of the TIFFANY Marks on its website has confused customers as to whether *Tiffany itself* was selling its own merchandise through eBay. All three of the witnesses whom Tiffany presented on this subject testified via affidavit that they chose to purchase jewelry through eBay rather than at a Tiffany store because they hoped to buy the jewelry for less than it would cost at a Tiffany store. (Badart Decl. ¶ 4; Byron Decl. ¶ 3; Lahood Decl. ¶ 3.) The facts proved at trial do not show that consumers believed that Tiffany had endorsed the sale of new jewelry through eBay, or that consumers believed that Tiffany was a sponsor or affiliate of eBay. In short, while customers may have been confused about whether the product they purchased was an authentic Tiffany silver jewelry item or a counterfeit, they were certainly not confused about the immediate

source of the silver jewelry — namely, individual eBay sellers.

Finally, the Court notes that Tiffany's "About Me" page on the eBay website clearly outlined the risks that consumers faced when purchasing Tiffany jewelry on eBay and that sellers faced when listing such jewelry for sale. (Chesnut Decl. ¶ 44.) Much like the disclaimer in *Playboy Enterprises*, the "About Me" page constituted an explicit disclaimer that Tiffany did not endorse or sanction the sale of its products through eBay.

Based on this evidence, the Court finds that eBay's use of the TIFFANY Marks did not suggest sponsorship or endorsement by Tiffany. Accordingly, the Court concludes that eBay's use of the TIFFANY Marks on its homepage was a protected nominative fair use and finds for the defendant with respect to these instances of alleged infringement.

b. Purchase of Sponsored Links

Tiffany next challenges eBay's practice of purchasing the keyword "Tiffany" as part of its sponsored links.[29] Tiffany has shown that eBay, for some time, purchased sponsored link advertisements on Yahoo! and Google advertising the availability of "Tiffany" items. (Briggs Decl. ¶ 25; Pl.'s Exs. 491, 1065.) While eBay has since ceased the direct

---

[29] By purchasing a "sponsored link," eBay ensured that when an Internet user typed the term "Tiffany" into a search engine, the search engine would generate, *inter alia*, a link to eBay's website. (Zalewska Decl. ¶ 121; Pl.'s Ex. 489.)

purchase of sponsored links,[30] eBay has, through its Commission Junction program, continued to reimburse sellers registered as "affiliates" for their purchase of sponsored links on Google that advertised the sale of Tiffany jewelry on eBay. (Pl.'s Ex. 477-480; 482; Tr. 469:4-470:2.) Tiffany asserts that this conduct constitutes direct trademark infringement. eBay urges the Court to conclude that under *1-800 Contacts, Inc. v. WhenU.com, Inc.*, 414 F.3d 400 (2d Cir. 2005), this conduct is not trademark "use" and thus is not infringing. For the reasons that follow, the Court concludes that *1-800 Contacts* is distinguishable from the instant case. Nevertheless, the Court finds that, even if eBay's conduct were to constitute "use" of

the trademark, the conduct at issue is protected as a nominative fair use.

As noted earlier, one element of trademark infringement is whether a trademark has been "use[d] in commerce." 15 U.S.C. § 1114(1)(a); *see also 1-800 Contacts, Inc.,* 414 F.3d at 412. In recent years, the question of what Internet usage of trademarks constitutes "use" under the Lanham Act has been extensively litigated. Courts in this Circuit, relying on *1-800 Contacts*, have routinely held that the use of a trademark in keywords and metatags, where the use is strictly internal and not communicated to the public, does not constitute "use" under the Lanham Act and thus does not support a Lanham Act claim. *See, e.g.*, *1-800 Contacts, Inc.*, 414 F.3d at 409 (reversing trial court's grant of a preliminary injunction against use of plaintiff's mark to trigger pop-up advertising); *Site Pro-1 Inc. v. Better Metal, LLC,* 506 F. Supp. 2d 123, 127-28 (E.D.N.Y. 2007) (holding that where neither link to defendant's website nor surrounding text mentions plaintiff or plaintiff's trademark, there is no trademark infringement in purchasing sponsored link); *Fragrancenet.com, Inc. v. FragranceX.com, Inc.,* 493 F. Supp. 2d 545, 555 (E.D.N.Y. 2007) (denying as futile plaintiff's motion for leave to amend complaint to include a count alleging trademark infringement by sponsored linking); *Merck & Co.*, 425 F. Supp. 2d at 415-16 (use of a trademark as a keyword to trigger defendants' websites as sponsored links did not involve placement of the trademark "on any goods or containers or displays" nor did it "indicate source or sponsorship" and therefore was not use for trademark purposes); *Rescuecom Corp. v.*

---

[30] The evidence in the record demonstrates that eBay ceased the practice of purchasing sponsored links for the TIFFANY Marks in 2003, in response to Tiffany's requests and in an effort to cooperate with Tiffany. (Briggs Decl. ¶¶ 25, 32.) Accordingly, eBay submits that this claim is moot. (Def.'s Post-Trial Mem. at 40 n.33.) Nevertheless, as a general rule, "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot." *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953)). Although a case may become moot "if the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated, this burden is a heavy one . . ." and has not been met here. *W. T. Grant Co.*, 345 U.S. at 633 (quotation omitted); *see, e.g.*, *Desiderio v. NASD*, 191 F.3d 198, 202 (2d Cir. 1999). *See also Hamzik v. Zale Corporation/Delaware*, No. 3:06-cv-1300, 2007 U.S. Dist. LEXIS 28981, at *10 n.5 (N.D.N.Y. Apr. 18. 2007) ("In any event, merely because Defendant quickly discontinued any offending conduct does not insulate them from any wrongful conduct, although it may serve to mitigate the extent of any liability.").

*Google, Inc.*, 456 F. Supp. 2d 393, 403 (N.D.N.Y. 2006) ("Defendant's internal use of plaintiff's trademark to trigger sponsored links is not a use of a trademark within the meaning of the Lanham Act, either because there is no allegation that defendant places plaintiff's trademark on any goods, containers, displays, or advertisements, or that its internal use is visible to the public.").[31]

Essential to the Second Circuit's reasoning in *1-800 Contacts* was the fact that the use of the trademarks was entirely internal. In that case, the plaintiff sought to enjoin defendant from using the plaintiff's mark to trigger pop-up advertising for defendant's website. Because the use of the trademark was entirely internal — as demonstrated by the fact that the Internet searcher saw only defendant's advertisement, not plaintiff's trademark — the use of the trademark was held to be "analogous to an individual's private thoughts about a trademark" and thus protected. *Id.* at 409. Similarly, in *Merck & Co.*, the Honorable Denny Chin, District Judge, dismissed a trademark infringement claim based on the purchase of sponsored links, applying the reasoning of *1-800 Contacts*. Judge Chin noted that the plaintiff's trademark had been used only in the sense that a computer user's search of the registered mark would trigger the display of sponsored links to the defendant's website. "This *internal use* of the mark . . . as a key word to trigger the display of sponsored links is not use of the mark in a trademark sense," he concluded. *Merck & Co.*, 425 F. Supp. 2d at 415 (emphasis added); *see also Merck & Co.*, 431 F. Supp. 2d at 427. In other words, under Second Circuit precedent, a company that makes internal use of another's mark to generate sponsored links is no different than a company that places its own advertisement in the Yellow Pages, right next to a listing for its well-known competitor. Therefore, to the extent that Tiffany challenges eBay's internal use of the term "Tiffany" to generate sponsored links to eBay, the law in this circuit is plain that internal use is not "use of the mark" in the trademark sense and eBay thus is not liable for direct infringement based on such conduct.

However, the instant case goes beyond the situation in *1-800 Contacts* because it does not merely involve internal use of a trademark. Rather, eBay's sponsored link purchases generated a link that displayed the TIFFANY Marks to the Internet searcher. For example, when a user typed in the search

---

[31] Nevertheless, courts outside of the Second Circuit have found otherwise, holding that internal uses of a plaintiff's mark are "use" under the Lanham Act. *See Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1239 (10th Cir. 2006) (reversing trial court's allowance of summary judgment in favor of defendant who allegedly used plaintiff's mark to trigger pop-up advertisements); *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1030 (9th Cir. 2004) (same); *J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC*, No. 06–0597, 2007 U.S. Dist. LEXIS 288, at *14-17 (E.D. Pa. Jan. 4, 2007) (finding that use of trademark in sponsored links is use under the Lanham Act); *Buying for the Home, LLC v. Humble Abode, LLC*, 459 F. Supp. 2d 310, 323 (D.N.J. 2006) (denying defendant's motion for summary judgment on plaintiff's trademark infringement claim based on sponsored links); *Edina Realty, Inc. v. TheMLSonline.com*, No. 04-CV-4371 (JRT), 2006 U.S. Dist. LEXIS 13775, at *9-10 (D. Minn. Mar. 20, 2006) (holding that purchase of search terms is a use in commerce); *Gov't Employees Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 703-04 (E.D. Va. 2004) (denying defendant's motion to dismiss on plaintiff's trademark infringement claim based on sponsored links).

term "Tiffany," the search engine generated a sponsored link that said, for example, "Tiffany for sale. New and Used Tiffany for sale. Check out the deals now! www.ebay.com." (Pl.'s Ex. 482.) Accordingly, eBay's use of the TIFFANY Marks resulted in the display of the TIFFANY Marks in conjunction with the eBay website address, and communicated the availability of Tiffany goods on eBay to the public. Therefore, eBay's use cannot be said to be limited to the *internal* use of a trademark in website operations. To extend the Yellow Pages analogy, it would be as if eBay purchased an ad in the Yellow Pages next to Tiffany's listing, and then used Tiffany's mark in its own advertisement.

Nevertheless, even if this type of activity were to constitute trademark "use" under the Lanham Act, *compare Hamzik*, 2007 U.S. Dist. LEXIS 28981, at *10-11 (plaintiff adequately alleged use where sponsored links generated plaintiff's trademark displays), *with S&L Vitamins*, 521 F. Supp. 2d at 201-02 (defendant's display of trademarks was not use under the Lanham Act since defendant actually sold the trademarked product on its website), the fact remains that such use is protected under the "nominative fair use" doctrine explained above. Put simply, eBay's use of the TIFFANY Marks in sponsored links is effectively identical to its use of the Tiffany name on the eBay website. Accordingly, the Court finds that eBay's practice of purchasing sponsored links to advertise Tiffany merchandise is protected by the defense of nominative fair use for the same reasons described above. *See supra* at Section III.C.2.a.

c. "Joint and Several Liability"

Tiffany also asserts that eBay is liable for direct trademark infringement "[j]ust as an officer or employee of a store selling infringing merchandise is jointly and severally liable with the store for that infringing sale." (Pl.'s Pr. Findings at 27). For this proposition, Tiffany cites *Gucci America, Inc. v. Exclusive Imports International*, No. 99 Civ. 11490 (RCC), 2007 WL 840128, at *6 (S.D.N.Y. Mar. 19, 2007). That case is wholly distinguishable. In *Gucci*, the defendants themselves took possession of and were the principal sellers of the counterfeit watches at issue. By contrast, Tiffany has stipulated that eBay never takes possession of items sold through its website, and that eBay does not directly sell the counterfeit Tiffany merchandise to buyers. (PTO at 7; Chesnut Decl. ¶ 41, Briggs Decl. ¶¶ 10-11.) Indeed, Tiffany's "joint and several liability" theory of direct infringement is misplaced, and is more properly addressed under the theory of contributory infringement, discussed *infra*.

For the foregoing reasons, the Court concludes that eBay is not liable for direct trademark infringement under state or federal law.

D. Contributory Infringement under Federal and Common Law

It is well established that "liability for trademark infringement can extend beyond those who actually mislabel goods with the mark of another." *Inwood*, 456 U.S. at 853; *see also Cartier Int'l B.V. v. Liu*, No. 02 Civ. 7926 (TPG), 2003 WL 1900852, at *3 (S.D.N.Y. Apr. 17, 2003) (finding an indirect actor liable for trademark counterfeiting when

the party knew or had reason to know it was engaging in trademark infringement); *Grant Airmass Corp. v. Gaymar Indus., Inc.*, 645 F. Supp. 1507, 1511 (S.D.N.Y. 1986) ("[L]iability under the Lanham Act has been construed to extend beyond those who actually misrepresent goods or directly place such goods in commerce."). Courts in this Circuit have recognized that "one may be held liable as a contributory infringer, notwithstanding the fact that one does nothing to assist an infringing party." *Power Test Petroleum Distribs. v. Manhattan & Queens Fuel Corp.*, 556 F. Supp. 392, 395 (S.D.N.Y. 1982) (citation omitted). The elements required to prevail on contributory trademark infringement and unfair competition claims under New York law mirror the Lanham Act claims for trademark infringement and unfair competition. *See Standard & Poor's*, 683 F.2d at 708. Accordingly, the Court will consider Tiffany's allegations of contributory infringement under state and federal law together.

The Court's analysis of Tiffany's contributory infringement claim proceeds in five parts. First, the Court concludes that the test articulated by the Supreme Court in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 546 U.S. 844 (1982), rather than the test articulated in the Restatement (Third) of Unfair Competition § 27 (1995), governs this claim. Second, the Court concludes that *Inwood* applies to entities like eBay that provide a marketplace for infringement and maintain direct control over that venue. Third, the Court concludes that, under *Inwood*, Tiffany's generalized assertions of trademark infringement are insufficient to establish that eBay knew or had reason to know of the infringement at issue.

Fourth, the Court concludes that eBay was not willfully blind to evidence of counterfeiting on its website. Finally, the Court concludes that when eBay had the requisite knowledge of infringement, eBay took appropriate steps to cut off the supply of its service to the infringer, both by removing the infringing listing and by eventually suspending the seller. Accordingly, the Court concludes that eBay is not liable for contributory trademark infringement.

1. Elements of Contributory Infringement

Contributory trademark infringement is a judicially constructed doctrine articulated by the Supreme Court in *Inwood*. In that opinion, the Supreme Court held that:

> [I]f a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily responsible for any harm done as a result of the deceit.

456 U.S. at 854.

The first prong of the *Inwood* standard for contributory trademark infringement, which recognizes contributory liability when "a manufacturer or distributor intentionally induces another to infringe a trademark," *Inwood*, 456 U.S. at 854, is inapplicable here, because Tiffany has not alleged that eBay intentionally induced infringement of Tiffany's marks. Tiffany relies instead upon the second prong of the *Inwood* standard, which recognizes contributory liability when

a "manufacturer or distributor . . . continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement." *Id.* Specifically, Tiffany claims that eBay "continues to provide its platform despite its knowledge, or reason to know, that counterfeit merchandise is being sold." (PTO at 2-3.)

As an alternative to the *Inwood* test, Tiffany proposes that the Restatement provides a separate basis for liability. The critical distinction between this alternative test and the *Inwood* test turns on the appropriate standard for knowledge. As noted above, *Inwood* requires that a plaintiff prove that the defendant "knows or has reason to know" that it is supplying its product to an infringer. *Inwood*, 456 U.S. at 854. Under the Restatement, however, a party may be found liable for contributory trademark infringement where "the actor fails to take reasonable precautions against the occurrence of the third person's infringing conduct in circumstances in which the infringing conduct can be reasonably anticipated." Restatement (Third) of Unfair Competition § 27 (1995). In short, Tiffany argues that the "test is whether wrongdoing by [a seller] 'might well have been anticipated by [eBay]." (Pl.'s Pr. Findings at 32 (quoting *Coca-Cola Co. v. Snow Crest Beverages, Inc.*, 64 F. Supp. 980, 989 (D. Mass. 1946) (citation omitted)).)

Tiffany's argument is foreclosed by *Inwood* itself. The *Inwood* majority, in response to Justice White's concurring opinion,[32] explicitly rejected the notion that it

was endorsing the "reasonable anticipation" standard, holding that "[i]f the Court of Appeals had relied upon [the reasonable anticipation standard] to define the controlling legal standard, the court indeed would have applied a 'watered down' and incorrect standard." *Inwood*, 456 U.S. at 854 n.13. To the contrary, the *Inwood* majority stated, the Court of Appeals had used the "reasonable anticipation" language merely to buttress the conclusion that the legal test for contributory infringement had been met. *See id.* at 854 n.13.

Not surprisingly, the majority of the courts that have considered this question since have rejected the "reasonable anticipation" standard for contributory infringement. *See, e.g.*, *GMC v. Keystone Auto. Indus.*, No. 02-74587, 2005 U.S. Dist. LEXIS 23168, at *35 n.21 (E.D. Mich. May 10, 2005) ("The Supreme Court specifically noted that a 'could reasonably anticipate' standard is not proper because it is a 'watered down' version of the proper test."), *rev'd on other grounds*, 453 F.3d 351 (6th Cir. 2006); *P&G v. Haugen*, 158 F. Supp. 2d 1286, 1294 (D. Utah 2001) ("[Plaintiff's] argument that [defendant] 'could anticipate the [infringement]' does not meet the standard for contributory infringement."); *Medic Alert Found. United States, Inc. v. Corel Corp.*, 43 F. Supp. 2d 933, 940 (N.D. Ill. 1999) ("The standard is not whether a manufacturer 'could reasonably anticipate' possible infringement,

<hr />

[32] Justice White voiced a concern that the Supreme Court had endorsed the "reasonable anticipation" standard, thus "silently [acquiescing] in a significant

change in the test for contributory infringement." *Inwood*, 456 U.S. at 860 (White, J. concurring). Justice White expressed his concern that the mere fact that a generic drug producer "can anticipate that some illegal substitution will occur to some unspecified extent, and by some unknown pharmacists, should not by itself be a predicate for contributory liability." *Id.*

but rather whether it knew or had reason to know that a third party is engaging in trademark infringement and continued to sell its products to that third-party."); *Lockheed Martin Corp. v. Network Solutions*, 175 F.R.D. 640, 646 (C.D. Cal. 1997) ("An allegation of mere negligence in supplying a product used to infringe does not meet this standard. *Inwood*, 456 U.S. at 854 n.13 (disapproving standard under which defendant would be liable for contributory infringement if defendant 'could reasonably anticipate' use of product to infringe)."); *David Berg & Co. v. Gatto Int'l Trading Co.*, 9 U.S.P.Q.2d (BNA) 1070, at *11 (N.D. Ill. 1988) ("That one 'could reasonably anticipate' an illegal use of the mark, however, is not sufficient" to establish contributory trademark infringement.); *but see Ciba-Geigy Corp. v. Bolar Pharm. Co.*, 547 F. Supp. 1095, 1116 (D.N.J. 1982) (holding that "reasonable anticipation" standard for the tort of passing off under section 43(a) of the Lanham Act remains the law in the Third Circuit), *aff'd*, 719 F.2d 56 (3d Cir. 1983) (*but see* dissenting opinion of Giles, J., concluding that *Inwood* "signaled the demise of the reasonable anticipation standard")).

For these reasons, the Court concludes that the plain language of *Inwood* forecloses the application of the "reasonable anticipation" standard as a basis to impose liability for contributory trademark infringement. The Court, accordingly, will not apply the "reasonable anticipation" standard.

### 2. Product, Service, or Venue

Under *Inwood*, to be liable for contributory trademark infringement, a manufacturer or distributor must continue to supply "its product" to an infringer. *Inwood*, 456 U.S. at 854. eBay argues that its website is not a "product," as defined by *Inwood*. Rather, eBay characterizes its website as a "*service* [that] does not trade in the *products* at issue." (Def.'s Pretrial Mem. at 11.) Specifically, eBay argues that its website is, instead, a "venue for listings created and posted by third parties." (Def.'s Pr. Concl. of Law at 28.) For this proposition, eBay relies on the Seventh Circuit's statement in *Hard Rock Café Licensing Corporation v. Concession Services, Inc.*, that it is "not clear how the doctrine [of contributory trademark infringement] applies to people who do not actually manufacture or distribute the good that is ultimately palmed off as made by someone else." 955 F.2d 1143, 1148 (7th Cir. 1992). Accordingly, eBay submits that where the thing supplied is a service, not a product, there is no basis for the imposition of contributory liability. (Def.'s Pretrial Mem. at 11; Def.'s Pr. Findings at 28.) In response, Tiffany argues that eBay has construed the case law too narrowly. The Court agrees with Tiffany that *Inwood* extends beyond merely imposing liability on a manufacturer or distributor of a product.

### a. Legal Standard

The distinction between products and services arises from the language that the Supreme Court used in *Inwood*. Because the specific conduct at issue in *Inwood* centered on the manufacture of a product, the Supreme Court's description of the elements of contributory infringement stated that the manufacturer or distributor is liable for contributory trademark infringement if it continues to supply a *product* to an infringer.

*Id.* at 854. It is this language upon which eBay relies.

Nevertheless, cases decided after *Inwood* have expanded the concept of contributory trademark infringement beyond the facts identified in *Inwood*, and have not limited liability for contributory infringement to situations involving misuse of a manufacturer's product. First, in *Hard Rock Café*, the Seventh Circuit considered the question of whether the owner of a flea market could be held liable for contributory trademark infringement on the grounds that vendors in the flea market were selling shirts that infringed the Hard Rock Café trademark. The court first noted that it is "not clear how the doctrine [of contributory trademark infringement] applies to people who do not actually manufacture or distribute the good that is ultimately palmed off as made by someone else." *Hard Rock Café*, 955 F.2d at 1148. This is the same language upon which eBay relies in arguing that liability does not extend to service providers and entities like itself. However, despite the fact that the flea market was clearly not a "product," the *Hard Rock Café* court determined that the common law imposed "the same duty on landlords and licensors that the Supreme Court has imposed on manufacturers and distributors." *Id.* at 1149. In reaching this conclusion, the court noted that the flea market operator was not merely a landlord, but advertised and promoted the activity on its premises, sold admission tickets to buyers, and supervised the premises. *Id.* at 1148. Accordingly, the court held that the *Inwood* test applied. *Id.* at 1149.

Similarly, in *Fonavisa, Inc. v. Cherry Auction, Inc.*, the Ninth Circuit reversed the trial court's decision to dismiss a claim against a swap meet operator with respect to the sale of counterfeit recordings. 76 F.3d 259, at 261-62 (9th Cir. 1996). In that case, there was evidence that numerous vendors operating at the swap meet had sold counterfeit recordings. The premise for liability was that the market's operator was supplying the necessary marketplace for the sale of counterfeit goods in substantial quantities. *Id.* at 264-65. While defendants argued that liability under *Inwood* was to be limited to manufacturers of products, the Ninth Circuit held that the Supreme Court in *Inwood* "laid down no limiting principle that would require defendant to be a manufacturer or distributor." *Id.* at 265. The court therefore reinstated the complaint and remanded the action to the trial court.

While the Second Circuit Court of Appeals has not yet reached this issue, other courts, including courts in this District, have similarly applied the *Inwood* test for contributory liability to venues that provide a service. *See Int'l B.V. v. Ben-Menachem*, No. 06 Civ. 3917 (RWS), 2007 U.S. Dist. LEXIS 95366, at *32 (S.D.N.Y. Jan. 3, 2008) (imposing contributory liability on owners and residents of home in which counterfeit operations occurred openly, who were also direct financial beneficiaries of counterfeiting operations); *Polo Ralph Lauren Corp. v. Chinatown Gift Shop*, 855 F. Supp. 648, 650 (S.D.N.Y. 1994) (sustaining claim for contributory liability for landlords who allowed trademark infringers to use their property); *see also Mini Maid Services Co. v. Maid Brigade Systems, Inc.*, 967 F.2d 1516 (11th Cir. 1992) (imposing liability on franchisers who allowed franchisees to infringe trademarks); *Habeeba's Dance of the*

*Arts, Ltd. v. Knoblauch*, 430 F. Supp. 2d 709, 714-15 (S.D. Ohio 2006) (sustaining claim for contributory liability for landlords who allowed trademark infringers to use their property).

In *Lockheed Martin Corporation v. Network Solutions, Inc.*, the Ninth Circuit, synthesizing the holdings of *Hard Rock Café* and *Fonavisa*, determined that whether the venue is online or in brick and mortar is immaterial. 194 F.3d 980, 984 (9th Cir. 1999). The relevant inquiry is, instead, "the extent of control exercised by the defendant over the third party's means of infringement." *Id.* at 984. The court further noted that "[d]irect control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark permits the expansion of *Inwood Lab.'s* 'supplies a product' requirement for contributory infringement." *Id.* at 984. Because the facts in *Lockheed Martin* demonstrated that the defendant was a service that did not have "direct control and monitoring" over those who infringed the plaintiff's mark, the court determined that the defendant, a contractor in charge of registering Internet domain names, was not contributorily liable as a matter of law. *Id.* at 985. Several courts have followed *Lockheed Martin* and assessed the extent of control exercised by the defendant over the actual infringer's means of infringement in determining whether a defendant may be contributorily liable. *See Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 807 (9th Cir. 2007) (declining to impose liability on website operator when operator did not have "the power to remove infringing material from these websites or directly stop their distribution over the Internet"); *SB Designs v. Reebok Int'l, Ltd.*, 338 F. Supp. 2d 904, 913 (N.D. Ill. 2004) (declining to impose liability on a service provider who lacked direct control); *Fare Deals, Ltd. v. World Choice Travel.com, Inc.*, 180 F. Supp. 2d 678, 689 (N.D. Md. 2001) ("To find contributory liability in the absence of the kind of direct control vested in the landlord of a landlord-tenant relationship 'would reach well beyond the contemplation of *Inwood Lab[oratories]* and its progeny.") (quoting *Lockheed Martin Corp.*, 194 F.3d at 985).

Accordingly, the Court concludes that *Inwood* can and has been read to impose liability for contributory trademark infringement beyond manufacturers and distributors of products. Given this broader application of *Inwood*, the Court finds the Ninth Circuit's reasoning in *Lockheed Martin* to be a persuasive synthesis of the relevant inquiry that the Court must undertake in determining whether the provider of a service is potentially liable for contributory trademark infringement, and will thus look to the extent of the control exercised by eBay over its sellers' means of infringement. In adopting the *Lockheed Martin* analysis, the Court notes that while this case has not been explicitly endorsed by the Second Circuit, it has been cited with approval in the Southern District of New York. *See, e.g.*, *Gucci Am., Inc. v. Hall & Assocs.*, 135 F. Supp. 2d 409, 416 n.14 (S.D.N.Y. 2001).

b. Analysis

In the case at hand, eBay clearly falls on the "service" side of the product/service distinction. Accordingly, the Court will look not only to whether eBay provided the necessary marketplace for the counterfeiting (which it clearly did), but further, to whether

eBay had direct control over the means of infringement. eBay argues that it lacked such control and indeed, that it is more like an online classified ads service than an online flea market, noting that it is undisputed that eBay never took possession of the items sold via its website, and that eBay could not physically inspect, examine, or authenticate such items. The evidence at trial also demonstrated that eBay has limited control over the listings and advertisements on its website, and that individual sellers have a great deal of latitude in describing the products that are for sale. (Def.'s Ex. 77; Briggs Decl. ¶ 12.) Nevertheless, in examining all of the facts that were proved at trial, the Court finds by a preponderance of the evidence that eBay exercises sufficient control and monitoring over its website such that it fits squarely within the *Fonavisa* and *Hard Rock Café* line of cases.

In reaching this conclusion, the Court first notes that while eBay itself does not sell or possess the items available on its website, eBay retains significant control over the transactions conducted through eBay. By providing the software to set up the listings and store listing information on its servers, eBay supplies the necessary marketplace for the sale of counterfeit goods. eBay takes an active role in supplying customers — namely, registered buyers — to registered sellers, and actively facilitates transactions between them.

Second, eBay has actively promoted the sale of Tiffany jewelry items. eBay advertises merchandise on its own website as well as through other websites, including until 2003, Google and Yahoo!. (Pl.'s Exs. 392, 1064.) eBay also actively works with sellers and PowerSellers to help them grow their jewelry

business. eBay's seminars, account management programs, and research on most frequently-searched terms all actively contribute to the sale of items on eBay. eBay even told its sellers that Tiffany was one of the "most effective keywords" and had one of the best "Returns on Investment." (Pl.'s Ex. 184; Zeig Dep. Tr. 141:21-145:4.) For example, in an eBay newsletter provided to its top jewelry sellers, in the section entitled, "Planning for Growth: Accelerate Your Sales," eBay advised its top sellers to "us[e] recommended keywords to boost sales," and identified "Tiffany & Co." as one such keyword. (Pl.'s Ex. 129.)

Third, eBay profits from the listing of items and successful completion of sales, through insertion fees and final value fees. (Briggs Decl. ¶ 20; Pl.'s Ex. 1151; Tr. 404:24-405:12.) eBay also profits by taking an additional percentage of the sales price if the transaction is consummated through PayPal. (Pl.'s Ex. 1156.)

Fourth, eBay maintains significant control over the listings on its website. Certain categories of items are entirely barred from the website, including drugs, firearms, and alcohol products. (Pl.'s Ex. 4.) The fraud engine screens listings and removes items that use specific terms in the listing description, for example, "counterfeit" or "fake." (Chestnut Decl. ¶ 4; Tr. 587:19-588:10.) Through eBay's User Agreements, users are required to abide by the terms of use, and eBay retains the right to suspend those users who fail to do so. (Chestnut Decl. ¶ 47; PTO at 7.)

Finally, to the extent eBay styles itself as a classified ad service, eBay's own witnesses

admitted that eBay maintains a classified ad service separate and apart from the eBay listings that are at issue in this action. (Tr. 397: 10-16.)[33]

Accordingly, the Court concludes that eBay is analogous to a flea market like those in *Hard Rock Café* and *Fonavisa*, and that it is inappropriate to compare eBay to an online classified ad service. *See also Hendrickson v. eBay Inc.*, 165 F. Supp. 2d 1082, 1084 n.2 (C.D. Cal. 2001) (rejecting eBay's characterization of itself as an online venue publishing 'electronic classified ads,' and finding that "eBay's Internet business features elements of both traditional swap meets — where sellers pay for use of space to display goods — and traditional auction houses where goods are sold in a highest bid process"). Therefore, eBay's conduct must be assessed under the standard for contributory negligence set forth in *Inwood*.

---

[33] During the course of this litigation, eBay has intermittently described itself as a "classified advertiser" (Chesnut Decl. ¶ 5), rather than an online auction house or flea market, in an apparent attempt to evade liability under *Inwood* as well as to qualify for the "innocent infringer" defense found in the Lanham Act, 15 U.S.C. § 1114(2). Specifically, Section 1114(2)(B) protects a "publisher or distributor of such newspaper, magazine, or other similar periodical or electronic communication . . . ." 15 U.S.C. § 1114(2)(B). Despite the fact that eBay never takes physical custody of the items sold on its website, eBay nevertheless exerts sufficient control over the listings on its website such that it cannot qualify as a mere online version of a newspaper or a magazine that publishes classified ads. Accordingly, the innocent infringer defense is inapplicable. *See Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1084 n.2 (C.D. Cal. 2001).

### 3. Knowledge Or Reason To Know

Under the *Inwood* test, Tiffany must prove that eBay continued to supply its services "to one whom it knows or has reason to know is engaging in trademark infringement." *Inwood*, 456 U.S. at 854. The evidence produced at trial demonstrated that eBay had *generalized* notice that some portion of the Tiffany goods sold on its website might be counterfeit. First, Tiffany sent eBay demand letters in 2003 and 2004, articulating its belief that large quantities of counterfeit Tiffany merchandise were being sold through the eBay website, and that any seller of a significant lot — *e.g.*, of five or more pieces of purported Tiffany jewelry — was "almost certainly" selling counterfeit merchandise. (Pl.'s Ex. 489, 490, 429.) Second, Tiffany apprised eBay of the results of its Buying Programs, particularly, of the supposed finding that 73.1% of the Tiffany items it purchased in its 2004 Buying Program were counterfeit. (Pl.'s Ex. 492.) Third, Tiffany filed thousands of NOCIs alleging a good faith belief that certain listings were counterfeit or otherwise infringing on Tiffany's marks, and eBay received numerous complaints from buyers stating that they had purchased what they believed to be fake Tiffany jewelry through the eBay website.

Tiffany argues that this generalized knowledge required eBay to preemptively remedy the problem at the very moment that it knew or had reason to know that the infringing conduct was generally occurring, even without specific knowledge as to individual instances of infringing listings or sellers. (Pl.'s Post-Trial Mem. at 20, 22.) By contrast, eBay asserts that such generalized knowledge is insufficient, and that the law

demands more specific knowledge of individual instances of infringement and infringing sellers before imposing a burden upon eBay to remedy the problem. (Def.'s Post-Trial Mem. at 9.)

Accordingly, before the Court is the question of whether eBay's *generalized* knowledge of trademark infringement on its website was sufficient to meet the "knowledge or reason to know" prong of the *Inwood* test.[34] For the following reasons, the Court concludes that while eBay clearly possessed general knowledge as to counterfeiting on its website, such generalized knowledge is insufficient under the *Inwood* test to impose upon eBay an affirmative duty to remedy the problem.

a. Legal Standard

The Second Circuit has not defined how much knowledge or what type of knowledge a defendant must have to satisfy the "know or reason to know" standard set forth in *Inwood*.[35] However, the Court's conclusion

that generalized knowledge is insufficient is supported in four ways. First, the plain language of *Inwood* states that the manufacturer or distributor is contributorily liable when "it continues to supply its product to *one* whom it knows or has reason to know is engaging in trademark infringement." *Inwood*, 456 U.S. at 854 (emphasis added). The Supreme Court's focus on individual infringers through its singular language is consistent with a requirement of specific, rather than general, knowledge. *See also Perfect 10*, 494 F.3d at 807 ("[A] defendant must have . . . continued to supply an infringing *product* to *an infringer* with knowledge that the infringer is mislabeling the *particular* product supplied.") (emphasis added).

Second, at least one district court in this circuit to address this issue has held that "trademark plaintiffs bear a high burden in establishing 'knowledge' of contributory infringement." *Gucci*, 135 F. Supp. 2d at 420. As noted by the Eleventh Circuit, the determination of knowledge under *Inwood* is a contextual and fact-specific test, such that a district court should "consider the nature and extent of the communication," whether the defendant "explicitly or implicitly encouraged the trademark violations," "the extent and nature of the violations being committed," and whether there was a "bad faith refusal to exercise a clear contractual power to halt the infringing activities. . . ." *Mini Maid*, 967 F.2d at 1522.

---

[34] To the extent that eBay had actual or constructive knowledge or reason to know of *specific* instances of infringement and *specific* infringing sellers, whether through NOCIs or other complaints, the question is whether eBay continued to supply its product to those sellers. *See Inwood*, 456 U.S. at 854. The Court will consider this argument *infra*.

[35] In the one Second Circuit case to address the "reason to know" standard, the court reversed a district court's dismissal of a motion for a preliminary injunction on the grounds of contributory trademark infringement. The Court held that "[a]lthough [defendant] denied knowledge of [a third party's] counterfeiting, it would not have taken a great leap of imagination for [defendant] to realize that, given their labelling, the [products] would have to be repackaged before they could be sold at retail." *Polymer Tech. Corp. v.*

*Mimran*, No. 92-7177, 1992 U.S. App. LEXIS 32204 at *18 (2d Cir. Nov. 25, 1992). The court reversed the district court for its failure to discuss this evidence. *Id.* at *18-19.

Third, courts have been reluctant to extend contributory trademark liability to defendants where there is some uncertainty as to the extent or the nature of the infringement. In *Inwood*, Justice White emphasized in his concurring opinion that a defendant is not "require[d] . . . to refuse to sell to dealers who merely *might* pass off its goods." *Inwood*, 456 U.S. at 861 (White, J., concurring). In *Coca-Cola Co. v. Snow Crest Beverages*, 64 F. Supp. 980 (D. Mass. 1946), *aff'd*, 162 F.2d 280 (1st. Cir. 1947), an early and important contributory infringement case cited in *Inwood*, Coca-Cola asserted that Snow Crest had contributorily infringed its mark by selling "Polar Cola" to bartenders who sometimes mixed the soda into customers' "rum and Coke" drinks. *Coca-Cola*, 64 F. Supp. at 989. Coca-Cola argued that Snow Crest should have known about the infringement because attorneys for Coca-Cola had informed Snow Crest's president of the bartending practice and indicated that their investigation revealed that the practice had occurred in 82 bars. *Id*. at 987-90. The district court found that such "lawyer's argumentative talk" was inadequate to establish that a reasonable businessperson in Snow Crest's position should have known that its products were being used to infringe, particularly because "plaintiff's counsel . . . did not give the names or the numbers of any offending bars," "did not inform defendant of the details of the investigation of the 82 bars," and "did not ask defendant to take any specific step to notify or caution bars against passing off." *Id.* The court reasoned that if it imputed knowledge to the defendant based on Coca-Cola's blanket demand, the court would be expanding Coca-Cola's property right in its trademark, allowing Coca-Cola to secure a monopoly over the entire mixed drink trade.

*See id.* Such generalized notice, the court reasoned, was simply inadequate to impute knowledge to the defendants. *See id.*

*Lockheed Martin Corp. v. Network Solutions, Inc.*, is particularly instructive in this matter. 985 F. Supp. at 965. In that case, the plaintiff sought to impose contributory trademark liability on defendant Network Solutions for accepting registrations of Internet domain names that were identical or similar to Lockheed Martin Corporation's SKUNK WORKS service mark. *Id*. at 950. Lockheed acknowledged that not all uses of the SKUNK WORKS mark were infringing, but contended that because Network Solutions reviewed registration requests, they were sufficiently on notice as to potential infringement. *Id*. at 963. The court disagreed, holding that "Lockheed's argument would require the Court to impute knowledge of infringement to NSI in circumstances where the use of the term 'skunk works' in a domain name may or may not be infringing. Such an expansion of contributory liability would give Lockheed a right in gross to control all uses of 'skunk works' in domain names." *Id*. at 965. Similarly, the court further held that even after receiving plaintiff's demand letters, Network Solutions would not have reason to know that the holders of the allegedly infringing domain names were in fact infringing. *Id.* at 967.

By contrast, those courts that have determined that defendants had "reason to know" of infringement have relied on far more specific notice from plaintiffs to defendants. For example, in *Habeeba's Dance of the Arts*, 430 F. Supp. 2d at 714, the court determined that advance written notice

of a specific infringing event, providing the date, the event, and the location of the event, would be sufficient to meet the knowledge requirement for contributory trademark infringement.

Significantly, Tiffany has not alleged, nor does the evidence support a conclusion, that all of the Tiffany merchandise sold through eBay is counterfeit. Rather, a substantial number of authentic Tiffany goods are sold on eBay, including both new and vintage silver jewelry, sometimes in lots of five or more. (*See, e.g.*, Def.'s Exs. 34, 270, 422.) As Justice White admonished, the doctrine of contributory trademark infringement should not be used to require defendants to refuse to provide a product or service to those who merely *might* infringe the trademark. *Inwood*, 456 U.S. at 861 (White, J., concurring) (observing that whether a defendant "can anticipate that some illegal substitution will occur to some unspecified extent, and by some unknown [parties], should not by itself be a predicate for contributory liability"). Were Tiffany to prevail on its argument that generalized statements of infringement were sufficient to impute knowledge to eBay of any and all infringing acts, Tiffany's rights in its mark would dramatically expand, potentially stifling legitimate sales of Tiffany goods on eBay.[36] *See Lockheed Martin*, 985 F. Supp. at 965; *Coca-Cola*, 64 F. Supp. at 989. Given the presence of authentic goods on eBay, it therefore cannot be said that generalized

---

[36] Indeed, in Tiffany's pre-litigation letters to eBay, Tiffany demanded that eBay "ban the sale of Tiffany silver jewelry" altogether. (Pl.'s Ex. 492 at 2.) Accordingly, there is at least some basis in the record for eBay's assertion that one of Tiffany's goals in pursuing this litigation is to shut down the legitimate secondary market in authentic Tiffany goods.

knowledge of counterfeiting is sufficient to impute knowledge to eBay of any specific acts of actual infringement. *See id.*

Fourth, contrary to Tiffany's assertion, neither *Fonavisa* nor *Hard Rock Café* support the notion that generalized knowledge is sufficient. *Fonavisa* is not applicable because it reached the Ninth Circuit after the district court granted a motion to dismiss on the pleadings. *See Fonavisa*, 76 F.3d at 265. On appeal, the court noted that there was no dispute, for the purpose of the appeal, that the operators of the swap meet had actual knowledge that its vendors were selling counterfeit merchandise. Thus, because the swap meet's knowledge was not at issue in the appeal, the court never reached the question of whether the facts in that case supported a finding of knowledge. *Id.* Similarly, in *Hard Rock Café*, the Seventh Circuit did not reach the question of whether the evidence supported a finding that the flea market had actual or constructive knowledge of the alleged infringement. *See Hard Rock Café*, 955 F.2d at 1149. Instead, the court simply reversed the district court's dismissal and suggested that the evidence *might* support a finding that the flea market operator had knowledge or was wilfully blind, based on the facts that the operator saw the allegedly infringing T-shirts, noticed that they "had cut labels and were being sold cheap," and nevertheless declined to ask further questions. *Id.*

In sum, neither precedent nor policy supports Tiffany's contention that generalized allegations of infringement provide defendants with knowledge or a reason to know of the infringement. This is particularly true where not all of the relevant

conduct is in fact infringing; just as courts have rejected the reasonable anticipation standard as an alternative to *Inwood*, courts have also rejected a standard that would reach conduct that only *might be* infringing. Instead, courts have required a much higher showing that a defendant knew or had reason to know of specific instances of actual infringement.[37]

### b. Analysis

The evidence adduced at trial demonstrates eBay had *general knowledge* of infringement by sellers using its website. Such general knowledge, however, does not require eBay to take action to discontinue supplying its service to all those who *might* be engaged in counterfeiting. Having concluded that, as a matter of law, general knowledge of infringement is insufficient, the Court proceeds to consider whether the generalized assertions of infringement made by Tiffany are sufficiently specific to impute to eBay knowledge of any and all instances of infringing sales on eBay. The Court concludes that Tiffany's general allegations of counterfeiting failed to provide eBay with the knowledge required under *Inwood*.

### i. Demand Letters and the "Five-or-More" Rule

As noted above, Tiffany provided eBay with demand letters in 2003 and 2004 asserting that counterfeiting was rampant on eBay's website and that any listing of five or more Tiffany items was presumptively counterfeit. (Pl. Ex. 489, 490). However, those courts to have considered the question have held that mere assertions and demand letters are insufficient to impute knowledge as to instances not specifically identified in such notices, particularly in cases where the activity at issue is not always infringing. *See, e.g.*, *Gucci*, 135 F. Supp. 2d at 420 (holding that "trademark owner's mere assertion that its domain name is infringed is insufficient to impute knowledge of infringement," and a demand letter is also insufficient); *Fare Deals, Ltd. v. World Choice Travel.com, Inc.*, 180 F. Supp. 2d 678, 690-91 (D. Md. 2001) (finding that demand letter notifying defendant of plaintiff's position is insufficient); *Lockheed Martin Corp.*, 985 F. Supp. at 964 (holding that "trademark owner's demand letter is insufficient to resolve . . . uncertainty" of infringement); *Coca Cola*, 64 F. Supp. at 987 (holding general complaints about counterfeiting insufficient to establish knowledge).

---

[37] In concluding that the law of contributory trademark infringement sets a high burden for knowledge, the Court draws support from the analogous doctrine of copyright infringement. It is well established that the property right protected by trademark law is narrower than that protected by copyright law, and thus, that liability for contributory infringement of a trademark is narrower than liability for contributory infringement of a copyright. *See Sony Corp. v. Universal City Studios*, 464 U.S. 417, 439 n.19 (1984); *Perfect 10*, 494 F.3d at 806; *Fonovisa*, 76 F.3d at 265 (noting that "trademark infringement liability is more narrowly circumscribed than copyright infringement"). Under copyright law, generalized knowledge that copyright infringement may take place in an Internet venue is insufficient to impose contributory liability. *See, e.g.*, *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1027 (9th Cir. 2001) ("The mere existence of the Napster system, absent actual notice and Napster's demonstrated failure to remove the offending material, is insufficient to impose contributory liability."); *Hendrickson*, 165 F. Supp. 2d at 1088-90 (holding that generalized notice of copyright infringements was insufficient to establish knowledge for the purpose of contributory liability).

In the face of this authority, Tiffany argues that its letters cannot be dismissed as general demand letters because they provided detailed notice to eBay of the problem and included the fact that there are no authorized third-party vendors for Tiffany merchandise. (Pl.'s Post-Trial Mem. at 27.) Thus, Tiffany asserts that it should have been apparent that any eBay seller offering five or more Tiffany items was almost certainly offering counterfeit merchandise. (*Id*. at 28; *see also* Pl.'s Ex. 489.) However, Tiffany has failed to present sufficient evidence demonstrating that a seller offering five items or more of Tiffany jewelry is presumptively dealing in counterfeit merchandise. Indeed, Tiffany's own CEO disavowed the importance of the five-or-more rule, calling it a "shorthand solution" and a "compromised effort" to make eBay "do a better job of preventing the sale of Tiffany counterfeit merchandise." (Tr. 822:14-23.) As extensively discussed in the Court's Findings of Fact, the precise contours of the "five or more" rule have shifted throughout litigation. Moreover, the evidence at trial demonstrated that the five-item limit is not regularly enforced by Tiffany itself, that lots of more than five identical Tiffany silver jewelry items are available through Tiffany's Corporate Sales Department and international trade accounts, and that lots of five or more pieces of authentic new Tiffany silver jewelry have been made available on eBay.

Accordingly, the record makes clear that not only was Tiffany ambiguous as to the precise contours of its proposed "five-or-more" rule, but that there is little support for the notion that the five-or-more rule presumptively demonstrated the presence of infringing items. eBay was under no obligation to credit the potentially self-serving assertions of a trademark owner, particularly when those assertions — such as the "five-or-more" rule — were unfounded, and when the trademark owner's demands, if met, clearly would have eliminated even legitimate sales on eBay. The doctrine of contributory trademark infringement cannot be used as a sword to cut off resale of authentic Tiffany items. *See Polymer Tech. Corp.*, 975 F.2d at 61-62 ("[T]rademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner"). Accordingly, the Court declines to impute knowledge or a reason to know of counterfeiting based on Tiffany's demand letters and its proposed five-or-more rule.

ii. Buying Programs

Tiffany next argues that the results of its Buying Programs provided eBay with knowledge of any and all instances of counterfeiting on eBay. The Court is unpersuaded. The actual results of the Buying Programs were provided to eBay only during post-complaint discovery. Accordingly, prior to the commencement of the instant litigation, the results of the Buying Programs were provided only in general, conclusory terms and merely put eBay on general notice that some counterfeit goods were being sold on eBay under the Tiffany mark. Yet this fact, alone, is not disputed; indeed, as discussed elsewhere, eBay had even prior to litigation taken steps to ensure that its website would not be a safe haven for sellers of counterfeit Tiffany goods.

Moreover, even assuming *arguendo* that eBay had complete knowledge of the Buying Programs at an earlier date, the Buying

Programs do not, by themselves, establish eBay's knowledge of specific instances of counterfeiting. The search criteria for the Buying Programs did not include any search term or screen designed to identify five or more listings. (Tr. 282:13-17; Mantis Decl. ¶ 8.) Thus, despite Tiffany's assertions that the "five-or-more" rule is the operative framework through which eBay should have known that a listing was counterfeit, the Buying Programs provided no probative information on that issue whatsoever. In addition, as noted above, the Buying Programs were methodologically flawed and of questionable value in any event. (Tr. 289:19-290:4; 290:21-291:2.)

Finally, the Buying Programs did not even purport to reflect the number of potentially counterfeit Tiffany items available on a typical day, because Tiffany entirely suspended its normal policing procedures during the programs. (*Id.* at 291:12-21; Def.'s Ex. 266 at TCO 87125-26; *see also* Ericksen Decl. ¶¶ 36-38.) On an ordinary day, Tiffany would report those listings it determined to be potentially counterfeit, and eBay would remove those listings. Accordingly, the items identified by Tiffany during the Buying Programs would likely have been removed by eBay had they been reported. (*See, e.g.*, Pl.'s Ex. 1082.)

To be sure, the amount of counterfeit merchandise discovered in the Buying Programs is voluminous. Nevertheless, the Buying Programs simply put eBay on notice that, absent Tiffany's routine policing efforts via the VeRO Program, a high percentage of the merchandise sold as Tiffany sterling was counterfeit. The Buying Programs also revealed that even when Tiffany totally refrained from participating in the VeRO Program, some quantity of the jewelry sold through eBay was, in fact, genuine. Accordingly, the Court finds that the Buying Programs did not provide eBay with the requisite notice under *Inwood*, nor did the Buying Programs demonstrate that there was any support for Tiffany's request that eBay ban listings of Tiffany silver jewelry in lots of five or more as presumptively counterfeit. The Buying Programs gave eBay only generalized knowledge that some infringement was occurring on its website. This information was insufficient to require eBay to ban all Tiffany listings, particularly because Tiffany presented no evidence that eBay ever failed to remove a specific listing that had been reported to eBay through a NOCI.

### iii. NOCIs and Buyer Complaints

Tiffany further argues that the large number of NOCIs that Tiffany has submitted to eBay since 2003, together with the volume of NOCIs from other rights owners and complaints from dissatisfied customers, should have put eBay on notice of the counterfeiting on its website. (Pl.'s Post-Trial Mem. at 28.) Prior to Tiffany's May 2003 demand letter (Pl.'s Ex. 489), Tiffany had already reported 1,182 listings to eBay that Tiffany believed to be infringing. After that letter, the number of NOCIs continued to increase every year. (Zalewska Decl. ¶¶ 74-78; Pl.'s Ex. 1082.) eBay produced customer complaints during a six-week period, from October 11, 2004 through December 31, 2004. During this relatively short time period, eBay received 125 emails from buyers stating that they had purchased fake Tiffany jewelry. (Pl.'s Ex. 493-625.)

Tiffany argues that not only did these complaints give eBay actual knowledge of specific infringing listings, they also provided eBay with general knowledge that a counterfeiting problem existed on its website. However, for the reasons described above, the Court finds that eBay responded appropriately to notice of specific infringing items, and that evidence of eBay's general knowledge of infringement is insufficient to impute knowledge to eBay of specific infringing listings.

#### 4. Willful Blindness

Tiffany argues that, "[f]aced with Tiffany's letters and other evidence that the problem existed, eBay was obligated to conduct an investigation to determine the extent of counterfeit Tiffany silver jewelry available on its site." (Pl.'s Post-Trial Mem. at 35.) Tiffany contends that eBay could have taken any number of steps to further investigate and understand the counterfeiting on its website, and that eBay's failure to do so constituted willful blindness, thus satisfying *Inwood's* knowledge requirement. (*Id.* at 35 n.31.) For the reasons below, the Court concludes that eBay was not willfully blind to evidence of infringement on its website.

#### a. Legal Standard

As noted above, *Inwood* requires a plaintiff to demonstrate that the defendant "knows or has reason to know" of a third party's trademark infringement. *Inwood*, 456 U.S. at 854. However, the "reason to know" standard can be satisfied by a showing that the defendant was willfully blind to the infringing activity. Willful blindness means a person must suspect wrongdoing and deliberately fail to investigate. *See Hard Rock Café*, 955 F.2d at 1149; *see also Louis Vuitton, S.A. v. Lee*, 875 F.2d 584, 590 (7th Cir. 1989) (finding that willful blindness occurs when defendant fails to inquire further because he is afraid of what the inquiry might yield); *Monsanto Co. v. Campuzano*, 206 F. Supp. 2d 1271, 1275 (S.D. Fla. 2002) (holding that willful blindness occurs when person suspects unlawful activity and purposefully fails to investigate).

#### b. Analysis

There is no dispute that eBay was *generally* aware that counterfeit Tiffany jewelry was being listed and sold on eBay even prior to Tiffany's initial demand letter. While the law does not impose a duty on eBay to take steps in response to generalized knowledge of infringement, the record is clear that eBay, nevertheless, made significant efforts to protect its website from counterfeiters. As described in the Findings of Fact, eBay has invested tens of millions of dollars in anti-counterfeiting initiatives, including the VeRO Program and the fraud engine.

Tiffany argues that these general anti-fraud measures were inadequate because eBay could have done more to prevent the listing of counterfeit goods, and that the failure to do more constitutes willful blindness. (Pl.'s Post-Trial Mem. at 35.) Specifically, Tiffany's expert witness testified that eBay could have delayed listings, implemented quantity filters, and conducted data mining to identify "suspicious" sellers much earlier than it eventually did. (Piatetsky-Shapiro Decl. ¶ 14; Tr. 665:4-665:11; 738:12-740:20; 659:10-659:13.)

The Court is unpersuaded that eBay's failure to adopt the measures identified by Dr. Piatetsky-Shapiro constituted willful blindness, for the reasons stated above in the Findings of Fact. *See supra* at Section II.J. Moreover, the record clearly shows that over the time period relevant to this litigation, eBay was continually taking steps to further refine its anti-fraud measures. While Tiffany may have been dissatisfied with the efficacy or volume of these steps, based on the evidence demonstrated at trial, it cannot be said that eBay failed to make reasonable inquiries or to take further steps to pursue counterfeiters. Finally, the fact that eBay developed many new anti-fraud measures after the commencement of litigation in this action does not demonstrate that eBay could have effectively or consistently adopted those measures any earlier. While individual anti-fraud mechanisms may have been technologically available at an earlier point in time, the Court credits the testimony of Robert Chesnut, eBay's Senior Vice President and Deputy General Counsel, who stated that

> [B]ecause of the nature of our systems, our systems usually push the edge of what was technologically capable, because our systems . . . were I think practically unique in terms of the loads that they placed on our computer systems. Our servers and our system would actually crash and our systems had come down in the past, because we reached, our site had reached the end of what was technically feasible to do. I can tell you as a whole as a company we pushed the envelope about what was available technologically.

(Tr. 765:8-17.) From this testimony, the Court concludes that eBay implemented the additional anti-fraud measures that Tiffany sought as soon as it was reasonably and technologically capable of doing so.

Tiffany further submits that in order to avoid liability for willful blindness, eBay was obligated to take steps such as conducting its own internal investigation or analyzing its data to prevent further infringement. (Pl.'s Post-Trial Mem. at 34-35.) On this point, it is clear that eBay did not conduct a separate investigation into the extent of counterfeit Tiffany jewelry on its website. (Tr. 682:24-684:15.) eBay did not analyze its data, or research and evaluate the number of "Tiffany" listings removed from its website. (Tr. 594:13-594:17.) Nor did it track the number of sellers suspended because they had posted infringing listings. (Tr. 597:10-598:10, 631:4-631:9; Pl.'s Ex. 1136.)

Nevertheless, the fact that eBay did not take these additional steps is immaterial, because without specific knowledge or reason to know, eBay is under no affirmative duty to ferret out potential infringement. Willful blindness requires "more than mere negligence or mistake" and does not lie unless the defendant knew of a high probability of illegal conduct and purposefully contrived to avoid learning of it, for example, by failing to inquire further out of fear of the result of the inquiry. *Nike, Inc. v. Variety Wholesalers, Inc.*, 274 F. Supp. 2d 1352, 1369-70 (S.D. Ga. 2003). Put simply, it cannot be said that eBay purposefully contrived to avoid learning of counterfeiting on its website, or that eBay failed to investigate once it learned of such counterfeiting. To the contrary, in the face of such general awareness, eBay took significant

steps to prevent counterfeiting by developing the VeRO Program, which seeks to remove individually infringing listings. Moreover, the record reveals that when eBay became aware, through its VeRO Program, of Tiffany's good-faith belief that a listing was infringing, it investigated and removed that listing from its website.

Were Tiffany to prevail in its argument that eBay was willfully blind, the "reason to know" standard of the *Inwood* test would be inflated into an affirmative duty to take precautions against potential counterfeiters, even when eBay had no specific knowledge of the individual counterfeiters. The law explicitly precludes such an expansion of the "reason to know" standard. *See Hard Rock Café*, 955 F.2d at 1149 (holding that there is "no affirmative duty to take precautions against the sale of counterfeits. Although the 'reason to know' part of the standard for contributory liability requires [defendant] to understand what a reasonably prudent person would understand, it does not impose any duty to seek out and prevent violations."); *Hendrickson*, 165 F. Supp. 2d at 1095 (holding that "no law currently imposes an affirmative duty on companies such as eBay to engage in such monitoring" of their websites, and that "eBay has no affirmative duty to monitor its own website for potential trade dress violation"); *Lockheed Martin*, 175 F.R.D. at 646.

In short, Tiffany has failed to establish by a preponderance of the evidence that eBay deliberately ignored counterfeiting activity of which it was aware. Rather, the evidence establishes that when eBay had general knowledge of counterfeiting on its website, it took reasonable steps to investigate and stop

that wrongdoing through general anti-fraud measures. Indeed, eBay has invested significant financial, technological, and personnel resources in developing tools to ferret out and eliminate counterfeit goods from its website. Accordingly, the Court concludes that eBay was not willfully blind to the evidence of counterfeiting on its website.

### 5. Continues To Supply

The Court has concluded that the generalized allegations of trademark infringement described above are insufficient to impute either knowledge or a reason to know of trademark infringement to eBay. However, the situation is distinct with respect to the individual sellers against whom Tiffany filed NOCIs. Tiffany argues that the filing of a NOCI provided eBay with actual or constructive knowledge of Tiffany's good-faith belief that an item was counterfeit or otherwise infringing.[38] Nevertheless, even assuming *arguendo* that the filing of a NOCI provided eBay with knowledge or reason to know of infringement by particular sellers on its website, the test under *Inwood* is not merely that eBay had knowledge, but instead whether eBay "continue[d] to supply" its product to known infringers. *Inwood*, 456 U.S. at 854. The *Inwood* test thus directs the Court to consider what action eBay took upon receiving such notice of infringement through Tiffany's NOCIs.

When Tiffany filed a NOCI, eBay's practice was to promptly remove the

---

[38] Of course, a NOCI was not a notice of actual infringement, but instead, was a notice of Tiffany's good-faith belief that a particular item or listing was infringing.

challenged listing from its website. In addition to removing the listing, eBay also warned sellers and buyers, cancelled all fees associated with the listing, and directed buyers not to consummate the sale of the listed item. Accordingly, the Court concludes that Tiffany has failed to prove that eBay continued to supply its services in instances where it knew or had reason to know of infringement.

### a. Standard

The *Inwood* test requires a plaintiff to prove that the defendant continued to supply its product to an infringer once it had knowledge of the infringement. *Inwood*, 456 U.S. at 854. Courts have routinely declined to impose liability where a defendant, once it possesses sufficient knowledge, takes "appropriate steps" to cut off the supply of its product or service to the infringer. *See, e.g.*, *Procter & Gamble v. Haugen*, 317 F.3d 1121, 1129-30 (10th Cir. 2003) (no contributory liability where the defendant, upon learning of activities of individuals who allegedly were directly liable under the Lanham Act, no longer continued to supply its product to those individuals); *AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1433 n.14 (3d Cir. 1994) (contributory liability could not be imposed where the defendant "took appropriate steps" "in the instances where [plaintiff] brought objectionable acts . . . to the attention of [defendant]") (internal citation and quotation marks omitted).

### b. Analysis

Tiffany argues that eBay continued to serve individual infringers by failing to take adequate steps in response to the filing of NOCIs by Tiffany. (Pl.'s Post-Trial Mem. at 36.) The Court disagrees. As discussed in the Findings of Fact, *supra*, the record is clear that once Tiffany notified eBay of a listing it believed to contain infringing merchandise, eBay promptly removed that listing from its website through its VeRO Program. Tiffany's attempt to prove that eBay failed to remove listings after they were reported was unsupported by the evidence. *See supra* at n.21. In any event, Tiffany's assertions were further contradicted at trial by Tiffany's concessions that eBay always acted in good faith and never refused to remove a listing after a NOCI had been filed. (Tr. 112:2-7, 146:10-14, 266:2-267:2, 814:18-22.) Therefore, Tiffany has failed to establish by a preponderance of the evidence that there were any instances where eBay was given specific notice of a potential infringement and failed to act.

Tiffany further argues that eBay allowed repeat offenders to sell counterfeit goods even after the filing of a NOCI. (Cacucciolo Decl. ¶¶ 42, 28; Zalewska Decl. ¶¶ 44, 59, 88.) Specifically, Tiffany identified several instances where a seller whose listings Tiffany had reported reappeared on the website using the same user name. (Cacucciolo Decl. ¶¶ 41-42; Zalewska Decl. ¶¶ 89-93; 149:25-150:3.) In addition, Tiffany purports to have identified 178 individuals, operating under different eBay user names, whom Tiffany reported on multiple occasions. In essence, Tiffany equates the filing of a NOCI with proof of counterfeiting and asserts that eBay's refusal to automatically and permanently suspend sellers upon the filing of a NOCI constitutes *per se* contributory trademark infringement under *Inwood*. Once again, the Court disagrees.

As noted above, a NOCI is not a determination of counterfeiting, but instead, is a good-faith assertion on the part of a rights holder that an item is counterfeit or otherwise infringing. This distinction is material because without knowledge of actual counterfeiting, Tiffany cannot demonstrate that eBay should have permanently suspended a seller. The evidence is clear that when eBay was informed that Tiffany had a good-faith belief that a seller was trafficking in counterfeit goods, eBay removed the listing. While Tiffany also requested that every such seller be permanently suspended (Cacucciolo Decl. ¶¶ 9, 24, 25, 48), eBay, as a rule, declined to automatically or permanently suspend a seller on the filings of a first, or even a second, NOCI. The Court finds that this policy was appropriate. As noted in the Findings of Fact, given the consequences of an eBay suspension, eBay reasonably proceeded with caution in suspending sellers based on NOCIs because NOCIs were a good faith determination of infringement, not an exact finding of infringement.

Tiffany's own evidence supports the Court's conclusion that eBay's policy was an "appropriate step" in cutting off the supply of its services to infringers. *AT&T*, 42 F.3d at 1433 n.14. While Tiffany identified close to 200 "repeat offenders," Tiffany does not contest that once Tiffany sent in a NOCI for these users, eBay pulled the listing. Furthermore, with only a few exceptions, the users who reappeared on the eBay website appeared three or fewer times, frequently within a very short time span (*e.g.*, within one week or even one day). Accordingly, Tiffany has failed to establish by a preponderance of the evidence that eBay failed to take appropriate action against these sellers upon receiving notice of infringing activity.

The law supports eBay's assertions that its practices in suspending sellers are appropriate. In *Winback* and *Haugen*, the courts based their findings that there could be no contributory liability on the fact that the defendants, while not having severed all ties with the alleged direct infringers, made other efforts to remediate the infringing conduct. *See Winback*, 42 F.3d at 1433 n.14; *Haugen*, 317 F.3d at 1129-30. This discretion and flexibility is particularly important given that a NOCI attests only to Tiffany's good-faith belief that an item is infringing. Indeed, Tiffany has occasionally been wrong and later requested that listings be reinstated.[39] (*See, e.g.*, Def.'s Ex. 34; 270, 422.)

Finally, Tiffany has argued that regardless of what action eBay took upon receiving a NOCI, eBay should nevertheless be held liable for contributory trademark infringement because eBay's efforts to remedy trademark infringement on its website through the VeRO Program were legally insufficient. (Pl.'s Post-Trial Mem. at 34.) Specifically, Tiffany submits that VeRO was an inadequate tool because Tiffany could not observe and report an item any earlier than the general public. Tiffany additionally contends that "there [were] simply too many listings of 'Tiffany' silver jewelry for Tiffany to be able to review

---

[39] In addition, it is certainly possible that other listings have been erroneously reported. Tiffany refuses to authenticate items without proof that the items were purchased from a Tiffany store. Several sellers have complained to Tiffany that their items were inappropriately reported, only to have Tiffany refuse to offer any meaningful way of validating their legitimacy. (Def.'s Ex. 157; 167; 175.)

them all" and that sales may have been consummated before a NOCI was filed and the listing taken down. (*Id.* at 37.) Finally, Tiffany objects to VeRO on the grounds that the program required Tiffany or its agents to devote substantial time and resources to determine whether or not the listing was counterfeit. (Tr. 230:3-230:23; Zalewska Decl. ¶ 47 n.4.) The Court rejects this argument.

First, the evidence does not demonstrate that anything about the VeRO Program made it unreasonably burdensome to capture the counterfeit listings on eBay. Instead, the evidence shows that Tiffany's commitment to reporting infringing listings through the VeRO Program has been sporadic and relatively meager. *See supra* at Section II.G.2.

Second, while the Court is sympathetic to Tiffany's frustrations in this regard, the fact remains that rights holders bear the principal responsibility to police their trademarks. See *MDT Corp. v. New York Stock Exch.*, 858 F. Supp. 1028, 1034 (C.D. Cal. 1994) ("The owner of a trade name must do its own police work."); *see also Hard Rock Café*, 955 F.2d at 1149 (defendants are not required "to be more dutiful guardians of [trademark plaintiffs'] commercial interests). In effect, Tiffany's contributory trademark infringement argument rests on the notion that because eBay was able to screen out potentially counterfeit Tiffany listings more cheaply, quickly, and effectively than Tiffany, the burden to police the Tiffany trademark should have shifted to eBay. Certainly, the evidence adduced at trial failed to prove that eBay was a cheaper cost avoider than Tiffany with

respect to policing its marks.[40] But more importantly, even if it were true that eBay is best situated to staunch the tide of trademark infringement to which Tiffany and countless other rights owners are subjected, that is not the law. *See* 2 McCarthy § 11:91 ("[T]he corporate owners of trademarks have a duty to protect and preserve the corporation's trademark assets though vigilant policing and appropriate acts of enforcement."); *MDT Corp.*, 858 F. Supp. at 1034; *see also Inwood*, 456 U.S. at 854 n.13 (holding that imposing liability where manufacturers could reasonably anticipate trademark violations is a "watered down" and incorrect standard).

Under these circumstances, the Court concludes that Tiffany has failed to prove that eBay continued to supply its service to those whom it knew or had reason to know were engaging in infringement, and that eBay took appropriate steps to cease making its website available in those instances where Tiffany brought objectionable conduct to its attention.

\* \* \* \*

In sum, the Court concludes that (1) eBay exerted sufficient control over its website such that the *Inwood* test applies; (2) under the *Inwood* test, the appropriate measure is whether eBay knew or had reason to know of, not whether eBay could reasonably anticipate, the infringement; (3) generalized knowledge is insufficient to impute knowledge of any and all instances of infringing activity to eBay; (4) Tiffany's demand letters, the Buying Programs, and the volume of NOCI reporting provided only generalized

---

[40] *Cf.* Guido Calabresi, The Costs of Accidents: A Legal and Economic Analysis (1970).

knowledge to eBay, which is insufficient to establish a duty to act; (5) eBay was not willfully blind to infringement; (6) when eBay had knowledge of specific infringing listings, eBay promptly terminated those listings; (7) when eBay had knowledge that a seller was repeatedly engaging in counterfeit activity, eBay's pattern was to suspend that seller and then take further corrective action; and finally, (8) to the extent Tiffany challenges the VeRO Program on the grounds that it is too time-consuming, the burden of policing the Tiffany mark appropriately rests with Tiffany.

### E. Remaining Causes of Action

Although Tiffany's contributory trademark infringement claims dominated the trial testimony and the post-trial submissions, Tiffany nevertheless maintains a number of other claims under the Lanham Act and state law. For the reasons set forth below, Tiffany has also failed to establish by a preponderance of the evidence that it is entitled to relief under these legal theories.

### 1. Unfair Competition under Federal and Common Law

Tiffany alleges unfair competition, infringement, and the use of false descriptions and representations under Section 43(a) of the Lanham Act and New York common law. (*See* Am. Compl. ¶¶ 46, 47, 50, 51.) Under Lanham Act § 43(a)(1)(A), to show unfair competition and false designation of origin, Tiffany must prove "(i) the existence of a valid mark, and (ii) that the defendant's actions are likely to confuse the buying public, that is, 'an appreciable number of ordinarily prudent purchasers.'" *Twentieth Century Fox*, 15 F. Supp. 2d at 20 (quoting

*E.G.L. Gem Lab Ltd. v. Gem Quality Institute, Inc.*, 90 F. Supp. 2d 277, 292 (S.D.N.Y. 2000)). Tiffany's Section 43(a) claims are governed by the same legal analysis as its federal infringement claims. *See, e.g.*, *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, No. 01 Civ. 5981 (LTS) (THK), 2004 WL 2158120, at *4 (S.D.N.Y. Sept. 28, 2004) (treating Lanham Act infringement and Section 43(a) claims jointly). Accordingly, because Tiffany's contributory and direct infringement claims fail, so too must its Section 43(a) claims.

Similarly, the elements required to prevail on trademark infringement and unfair competition claims under New York common law mirror the Lanham Act claims for trademark infringement and unfair competition. *Standard & Poor's*, 683 F.2d at 708. Thus, "to prevail on a claim for unfair competition under New York common law, 'a plaintiff must couple its evidence supporting liability under the Lanham Act with *additional* evidence demonstrating the defendant's bad faith.'" *Omicron Capital, LLC v. Omicron Capital, LLC*, 433 F. Supp. 2d 382, 395 (S.D.N.Y. 2006) (citations omitted) (emphasis added); *Lorillard*, 378 F. Supp. 2d at 456 (emphasis added); *see also Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980) ("The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another. Central to this notion is some element of bad faith.") (citations omitted).

Since Tiffany has failed to prove its Lanham Act claims, it follows *a fortiori* that it has failed to prove its common law claims as well. Moreover, insofar as eBay routinely

removed listings that Tiffany reported to it and took numerous additional measures to reduce the number of listings offering potentially infringing Tiffany items, Tiffany has failed to adduce either the requisite showing of infringement or any additional evidence of bad faith by eBay here.

### 2. False Advertising Under Lanham Act Section 43(a)(1)(B)

Tiffany challenges certain advertising practices in which eBay previously engaged, specifically: (i) references to Tiffany merchandise in promotional features on the eBay home page and Jewelry & Watches page; and (ii) purchases of the "Tiffany" keyword so as to indicate the availability of Tiffany merchandise on eBay via "sponsored links" on Internet search engines such as Google and Yahoo!.[41] Tiffany argues that by using the TIFFANY Marks on its website and in sponsored links, eBay violated Section 43(a)(1)(B) of the Lanham Act. (Pl.'s Pr. Findings 29-30.)

The Lanham Act expressly forbids false or misleading descriptions or representations of fact concerning "the nature, characteristics, qualities, or geographic origin of . . . goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B).[42] To prevail on a false advertising claim under the Lanham Act, "a plaintiff must show that either: 1) the challenged advertisement is literally false, or 2) while the advertisement is literally true it is nevertheless likely to mislead or confuse consumers." *Johnson & Johnson-Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992); *see also Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997); *McNeil-PPC, Inc. v. Pfizer Inc.*, 351 F. Supp. 2d 226, 248 (S.D.N.Y. 2005). Plaintiffs may also show that the claim is false by necessary implication. *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007).

"Whereas plaintiffs seeking to establish a literal falsehood must generally show the substance of what is conveyed, . . . a district court must rely on extrinsic evidence [of consumer deception or confusion] to support a finding of an implicitly false message." *Time Warner Cable*, 497 F.3d at 154 (internal quotation omitted); *Johnson & Johnson-Merck*, 960 F.2d at 297 ("[P]laintiff must demonstrate, by extrinsic evidence, that the challenged commercials tend to mislead or confuse consumers."). "It is not for the judge to determine, based solely upon his or her own intuitive reaction, whether the advertisement is deceptive." *Johnson & Johnson-Merck*, 960 F.2d at 297 (affirming

---

[41] Tiffany brings false advertising claims exclusively under federal, not state, law.

[42] The statute provides, in pertinent part, that:
Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a)(1)(B).

final judgment after bench trial). Rather, "the question in such cases is — what does the person to whom the advertisement is addressed find to be the message?" *Id*.

Because authentic Tiffany merchandise is sold on eBay's website, Tiffany has failed to prove that eBay's challenged advertising practices are literally false. Tiffany argues that while the advertising might be literally true, it is nevertheless likely to mislead or confuse consumers into believing that any given piece of silver jewelry labeled "Tiffany" is genuine, when in fact, a consumer is more likely to receive counterfeit silver jewelry than authentic silver jewelry. (*See* Pl.'s Pr. Findings at 30.) Tiffany's false advertising claims focus on the same practices that Tiffany's direct trademark infringement claims relied on — namely, the use of the Tiffany mark on the eBay website and the purchase of the TIFFANY Marks in generating sponsored links — and are unsuccessful for the same reasons.

First, eBay's use of the term "Tiffany" in advertising is protected, nominative fair use. Second, to the extent that Tiffany argues that eBay's advertising is impliedly false, that argument rests on Tiffany's assertion that eBay knew that jewelry sold on its website was counterfeit. While eBay certainly had generalized knowledge that Tiffany products sold on eBay were often counterfeit, Tiffany has not proven that eBay had specific knowledge as to the illicit nature of individual listings. Finally, to the extent that the advertising was false, the falsity was the responsibility of third party sellers, not eBay. *See Merck & Co.*, 425 F. Supp. 2d at 415 (holding that "there is nothing improper with defendants' purchase of sponsored links"

when "defendants actually sell [plaintiff's products] . . . on their website"). In short, Tiffany failed to establish that eBay's ads were likely to mislead consumers because authentic items were offered for sale, and inauthentic items were only listed on eBay due to the illicit acts of third parties. Having concluded that eBay did not continue to supply its service to infringers, it cannot be said that eBay was misleading customers when eBay was diligently removing listings from the website that were purportedly counterfeit.

Finally, the Court notes that in analogous circumstances, courts have rejected similar claims asserted against eBay. *See, e.g.*, *Gentry v. eBay*, 99 Cal. App. 4th 816, 834, 836 (Cal. Ct. App. 2002) (rejecting claim challenging, *inter alia,* eBay's promotional activities because that claim "would place liability on eBay for simply compiling false and/or misleading content created by the individual defendants and other coconspirators" and hence "eBay's liability would be based upon the misrepresentations of the individual defendants").[43]

### 3. Trademark Dilution Under Federal and Common Law

As yet another variation on its contributory infringement claim, Tiffany also alleges that eBay's activities constitute trademark dilution under the Lanham Act, 15 U.S.C. § 1125(c), as well as under New York General Business Law § 360-1. (Am. Compl.

---

[43] While *Gentry* arose under California state law and was decided in part based on the Communications Decency Act, 47 U.S.C. § 230, the underlying reasoning is instructive.

¶¶ 52-55.) Specifically, Tiffany argues that eBay is liable for dilution by blurring because eBay uses the Tiffany name to advertise and sell products that eBay knows to be counterfeit, thus resulting in the "'diminution of the capacity of [Plaintiff's] mark [] to serve as a unique identifier of its products and services.'" (Pl.'s Pr. Findings at 38 (quoting *New York Stock Exch., Inc. v. New York, New York Hotel, LLC*, 293 F.3d 550, 557 (2d Cir. 2002).) Tiffany also alleges that eBay is liable for dilution by tarnishment because eBay's use of the TIFFANY Marks harms Tiffany's reputation. (Pl.'s Pr. Findings at 38.) Tiffany submits that by linking Tiffany's marks to products of shoddy quality, "the public will associate, and continue to associate, the lack of quality or lack of prestige in the goods sold on eBay with genuine Tiffany goods." (Pl.'s Pr. Findings at 38-39.) The Court concludes that Tiffany has failed to prove that eBay is liable for trademark dilution and that even assuming *arguendo* that eBay could be liable for dilution, eBay's use of the TIFFANY Marks is a protected, nominative fair use.

a. Legal Standard

The legal theory of dilution is grounded in the notion that a trademark can lose its "ability . . . to clearly and unmistakably distinguish one source through unauthorized use." *Hormel Foods Corp. v. Jim Henson Prods.*, 73 F.3d 497, 506 (2d Cir. 1996) (internal quotation omitted). Anti-dilution statutes protect against the "gradual whittling away of a firm's distinctive trade-mark or name." *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 544 (1977). Trademark dilution is a broader, and more subtle, principle than classic trademark infringement.[44]

As a preliminary matter, the Court must consider which federal anti-dilution statute applies to this case. When Tiffany filed its Amended Complaint on July 14, 2004, it did so under the Federal Trademark Dilution Act ("FTDA"), 15 U.S.C. § 1125(c) (2004). After the Amended Complaint had been filed, Congress enacted the Trademark Dilution Revision Act of 2006 ("TDRA"), Pub. L. No. 109-312, 120 Stat. 1730, 1731 (Oct. 6, 2006), which entitles the owner of a famous, distinctive mark to an injunction against the user of a mark that is "likely to cause dilution" of the famous mark. 15 U.S.C. § 1125(c)(1). Congress thus overruled the Supreme Court's holding in *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 433

---

[44] One of the key distinctions between trademark infringement and trademark dilution is that the anti-dilution statutes provide more expansive protection than trademark infringement claims. In a classic trademark infringement claim, the owner of a mark may bar another from using a mark in a manner that creates a likelihood of consumer confusion as to the source of goods. *See* 15 U.S.C. § 1125(a). Thus, "as a general proposition, under traditional trademark law, a mark is enforceable within the area of commerce in which the mark has been established. However, its establishment in one segment of commerce generally does not prevent others from using the same or a similar mark in a different, non-competing area" because "ordinarily, little confusion will result when the junior use is in an area of commerce that is outside the senior owner's area." *TCPIP Holding*, 244 F.3d at 94-95. By contrast, federal anti-dilution law permits the owner of a qualified, famous mark to enjoin junior uses throughout commerce, regardless of the absence of competition or confusion. *See* 15 U.S.C. § 1125(c)(1). Specifically, this means that trademark dilution can be found even when the defendant's goods are in a wholly different area of commerce than plaintiff's goods, and thus do not cause any likelihood of confusion. *See TCPIP Holding Co.*, 244 F.3d at 95.

(2003), that the FTDA requires a showing of "actual dilution," and reasserted the less stringent "likelihood of dilution" standard to dilution cases.[45]

The Second Circuit has held that the TDRA applies retroactively to a claim filed before the TDRA went into effect to the extent that the plaintiff seeks injunctive relief. *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 477 F.3d 765, 766 (2d Cir. 2007). Because Tiffany seeks injunctive relief, the TDRA is applicable to its claims.[46]

The TDRA provides that:

Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1). Under the TDRA, therefore, to establish a violation of the Act, a plaintiff must show that: (1) its mark is famous; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use is likely to cause dilution by tarnishment or dilution by blurring.

New York's dilution cause of action is substantially similar. Under New York General Business Law § 360-l, "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." N.Y. Gen. Bus. L. § 360-l (McKinney's 2007).

Prior to the enactment of the TDRA, state and federal dilution claims were viewed as analogous. *See Louis Vuitton Malletier*, 454 F.3d at 119 (applying same standards to federal and New York dilution standards);

---

[45] In addition, the TDRA required that the defendant show "use in commerce," rather than the FTDA's "commercial use of the mark in commerce." *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 118 (2d Cir. 2006) (quoting *Savin Corp.*, 391 F.3d at 448-49).

[46] To the extent that Tiffany seeks monetary damages on its dilution claim, however, the FTDA's standard of "actual dilution" continues to apply. The TDRA includes a clear date restriction that authorizes the application of the "likelihood of dilution" standard as a basis for recovering damages to civil actions where the diluting mark or trade name was first introduced in commerce after October 6, 2006. *See* 15 U.S.C. § 1125(c)(5). In short, Congress has unambiguously stated that the TDRA does not apply retroactively to the extent that plaintiffs seek damages. *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 500 F. Supp. 2d 276, 283 (S.D.N.Y. 2007). Accordingly, under the FTDA, in order to obtain monetary damages, Tiffany would still have to show actual dilution, in addition to the wilfulness requirement retained by the TDRA, for claims of monetary relief. *See Verilux, Inc. v. Hahn*, No. 3:05cv254 (PCD), 2007 U.S. Dist. LEXIS 58507, at *36-37 (D. Conn. 2007); *Dan-Foam A/S & Tempur-Pedic, Inc. v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 306 (S.D.N.Y. 2007).

*Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 215 n.1 (2d Cir. 1999) (stating that federal and New York dilution statutes are "analogous"); *NBA Props. v. Untertainment Records LLC*, No. 99 Civ. 2933 (HB), 1999 U.S. Dist. LEXIS 7780, at *21 (S.D.N.Y. May 26, 1999) (stating that FTDA "mirrors" New York statute). While the Second Circuit has cautioned district courts that "it is not clear that the [New York] statute is coextensive with the [TDRA]," *Starbucks Corp.*, 477 F.3d at 766, both the federal and the state statutes require that plaintiffs show a likelihood of dilution, rather than actual dilution. Moreover, the state and federal statutes both require that plaintiffs show that defendants have used the mark in commerce. *See FragranceNet.com*, 493 F. Supp. 2d at 548 (holding that "the 'use' requirement exists for . . . proposed state law claims and is analyzed in the same manner as under the federal claims"). Thus, while the two statutes may not be identical, they are substantively similar and may be analyzed together.

## b. Analysis

The Court concludes that the first and third elements of trademark dilution have been met. With respect to the first, it is abundantly clear that the TIFFANY Marks at issue in this litigation are famous; indeed, eBay has not disputed the point. *See also* 4 McCarthy § 24:87 ("Clearly, nationally famous marks like . . . TIFFANY . . . have the strong, distinctive quality of fame which is deserving of protection from dilution." (citing *Tiffany & Co. v. Boston Club, Inc.*, 231 F. Supp. 836, 842-43 (D. Mass. 1964)). With respect to the third element, it is clear from the record and undisputed by the parties that

eBay began its use of the mark well after Tiffany's marks became famous.

Nevertheless, even assuming *arguendo* that Tiffany can establish the third element of trademark dilution – eBay's use of the TIFFANY Marks in commerce – the Court finds that Tiffany has failed to show that eBay used the marks in a way that was likely to cause either dilution by blurring or dilution by tarnishment. Moreover, the Court further finds that eBay's use of the TIFFANY Marks on its website and through its purchase of sponsored links was protected by the statutory defense of nominative fair use.

### i. Dilution by Blurring

Dilution by blurring is defined in the TDRA as an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). Blurring occurs "where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Deere & Co.*, 41 F.3d 39, 43 (2d Cir. 1994) (emphasis omitted); *accord N.Y. Stock Exch.*, 293 F.3d at 558; *see also Nabisco*, 191 F.3d at 215.

Trademark dilution claims usually arise where a defendant has used the plaintiff's trademark to directly identify a different product of the defendant. Thus, dilution may occur "where the defendant uses or modifies the plaintiffs trademark to identify the defendant's goods and services." *Deere & Co.*, 41 F.3d at 43. Such use of the plaintiff's trademark may "dilute" or weaken the ability

of the famous mark to "clearly identify and distinguish only one source." 4 McCarthy § 24:67. For example, hypothetical examples of dilution by blurring might include Dupont shoes, Buick aspirin, Kodak pianos, or Bulova gowns. *See Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1031 (2d Cir. 1989). Indeed, the "primary application of the Act is to cases involving widely different goods (*i.e.*, Kodak pianos and Kodak film)." *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 49 (1st Cir. 1998). As the First Circuit noted, "[n]o one would confuse Kodak pianos with Kodak film, but the use of the name on the piano could dilute its effectiveness as a mark for the film." *Id.*

In this case, Tiffany has failed to demonstrate that eBay's promotional efforts were likely to dilute the identification of the TIFFANY Marks with the Tiffany brand. While eBay has certainly used the plaintiff's trademark to describe products available on the eBay website, eBay has *not* used the Tiffany mark to identify *its own* goods and services. To the contrary, eBay never used the TIFFANY Marks in an effort to create an association with its own product, but instead, used the marks directly to advertise and identify the availability of authentic Tiffany merchandise on the eBay website.

Moreover, although Tiffany may have viable trademark dilution claims against individual sellers who listed counterfeit Tiffany merchandise on eBay, *see General Motors Corp. V. Autovation Technologies Inc.,* 300 F. Supp.2d 756, 763 (E.D.Mich. 2004) (use of counterfeit trademarks on automotive parts "would likely cause blurring of the source of the goods" and thus satisfies the final element of trademark dilution)

(internal quotations omitted), those claims could hardly be extended to eBay, which, as noted above, consistently removed such listings upon notice that Tiffany had a good-faith belief that the listings might be infringing.

Under these circumstances, Tiffany has not established dilution by blurring in eBay's use of the TIFFANY Marks.

## ii. Dilution by Tarnishment

Dilution by tarnishment reflects an "association arising from the similarity between a mark or a trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c). A trademark may be tarnished when it is "linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context," with the result that "the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *Deere & Co.*, 41 F.3d at 43. The mark may also be tarnished if it loses its ability to serve as a "wholesome identifier" of plaintiff's product. *Id*; *see also GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 301 (S.D.N.Y. 2002) (explaining that tarnishment is likely when a lower quality product is marketed with a substantially similar mark to that of a higher quality product of the same type); *Toys R Us, Inc. v. Feinberg*, 26 F. Supp. 2d 639, 644 (S.D.N.Y. 1998), *rev'd on other grounds*, 201 F.3d 432 (2d Cir. 1999) (noting that tarnishment can result from a mark's association with an inferior product, not just an offensive product). Indeed, "the *sine qua non* of tarnishment is a finding that the plaintiff's

mark will suffer negative associations through defendant's use." *Hormel*, 73 F.3d at 507.

Nevertheless, just as the dilution by blurring claim fails because eBay has never used the TIFFANY Marks to refer to eBay's own product, the dilution by tarnishment claim also fails. Indeed, while eBay has used the Tiffany trademarks in promotional efforts and in advertising, the Tiffany trademarks have always been associated with products that individual third party sellers have characterized as Tiffany items. Any identification of a different product was the result of third-party eBay-users offering for sale counterfeit Tiffany items. The evidence established that when eBay obtained knowledge of listings offering such items, it removed them. Indeed, having concluded that when eBay has knowledge or a reason to know of infringement on its website, it takes appropriate steps to discontinue supplying its website to the infringer, it would defy logic to nevertheless conclude that eBay is tarnishing Tiffany's mark. Under these circumstances, Tiffany has failed to demonstrate dilution by tarnishment in eBay's use of the TIFFANY Marks.

### iii. Defenses to Dilution

Even assuming *arguendo* that Tiffany had established the elements of its dilution claim, the TDRA excludes several forms of trademark use from dilution claims. These exclusions include "[a]ny fair use, including a nominative or descriptive fair use, or facilitation of such fair use, of a famous mark by another person other than as a designation of source for the person's own goods or services, including use in connection with advertising or promotion that permits consumers to compare goods or services." 15 U.S.C. § 1125(c)(3)(A)(i). In *Playboy Enterprises*, the Ninth Circuit addressed the nominative fair use exception to the anti-dilution statute, and held that "[u]ses that do not create an improper association between a mark and a new product but merely identify the trademark holder's products should be excepted from the reach of the anti-dilution statute. Such uses cause no harm." 279 F.3d at 806; *see also Toni & Guy (USA) Ltd. v. Nature's Therapy, Inc.*, No. 03 CV 2420 (RMB), 2006 U.S. Dist. LEXIS 25291, at *40 (S.D.N.Y. May 1, 2006) (declining to impose liability for trademark dilution where defendant's use of plaintiff's mark was comparative advertisement and posed no risk of diluting selling power of the competitor's mark, but instead allowed consumers to compare relative merits of competing products).

Under the same principle, the Court holds that eBay's use of the TIFFANY Marks falls into the anti-dilution statute's nominative fair use exception. First, as described earlier in this decision, eBay's promotional use of the TIFFANY Marks is protected, nominative fair use. Second, eBay's use of the TIFFANY Marks does not designate the source for eBay's goods; instead, it simply indicates that products bearing the TIFFANY Mark are available through eBay. Finally, while eBay's use of the TIFFANY Marks is not in connection with comparative advertising, it is in connection with advertising of the availability of products through the eBay website, and thus allows consumers to compare prices and the availability of specific Tiffany designs. Accordingly, the Court finds that even if Tiffany had made out a viable claim for trademark dilution, it would be

barred by the nominative fair use exception recognized in the anti-dilution statute.

### 4. Contributory Dilution

In addition to alleging that eBay has engaged in direct trademark dilution, Tiffany also urges the Court to find that eBay has contributorily diluted its trademark. (Pl.'s Pr. Findings at 39.) "The one court to recognize the contributory dilution cause of action defined the claim as encouraging others to dilute." *Lockheed Martin*, 194 F.3d at 986 (citing *Kegan v. Apple Computer Inc.*, 42 U.S.P.Q.2D (BNA) 1053, 1062 (N.D. Ill. 1996)). Contributory dilution has not been recognized in the Second Circuit Court of Appeals. Indeed, even the one district court in this circuit that mentioned the doctrine acknowledged that it is somewhat "novel." *Steinway, Inc. v. Ashley*, No. 01 Civ. 9703 (GEL), 2002 U.S. Dist. LEXIS 1372, at *7 (S.D.N.Y. Jan. 29, 2002) (denying motion to dismiss on contributory infringement claim).

However, even assuming *arguendo* that a contributory dilution claim exists, it would fail for the reasons set forth above with respect to Tiffany's contributory infringement claims. *See id.* (stating that claim for contributory dilution is "novel" and that claim would be analogous to contributory infringement); *Lockheed Martin*, 194 F.3d at 986 (recognizing that "no appellate court or statute has yet established the cause of action" for contributory dilution and that it would require proof of "encouraging others to dilute"); *Lockheed Martin*, 175 F.R.D. at 646 (noting that "[i]f the standard is this narrow for contributory infringement. . . , the standard should certainly be at least as narrow for contributory dilution, which is grounded in a much more subtle and evasive concept of injury to a mark") (internal quotation marks and citation omitted).

Having found that Tiffany has not carried its burden with respect to contributory trademark infringement, the Court likewise concludes that Tiffany's contributory dilution claim must fail. Put simply, Tiffany has failed to demonstrate that eBay knowingly encouraged others to dilute Tiffany's trademarks. Rather, to the extent that eBay may have possessed general knowledge of infringement and dilution by sellers on its website, eBay did not possess knowledge or a reason to know of specific instances of trademark infringement or dilution as required under the law. *See Inwood*, 456 U.S. at 854. Moreover, in those instances in which the filing of a NOCI provided eBay with a reason to know of possible infringement or dilution, it is clear that eBay took immediate and affirmative steps to remove the challenged listings from its website. Thus, it cannot be argued that eBay was "contributorially responsible for any harm done as a result of the deceit" by third party sellers. *Id.*

* * * *

In sum, the Court concludes that Tiffany has failed to meet its burden in proving its claims. The Court makes no finding as to whether Tiffany might prevail were it to sue individual eBay sellers on any of these legal theories, or as to whether criminal prosecutions might be initiated against individual sellers. Nevertheless, given Tiffany's choice to sue eBay, rather than individual sellers, and this Court's conclusion that eBay does not continue to supply its services to those whom it knows or has reason

to know are infringing Tiffany's trademarks, Tiffany's claims against eBay must fail.

## IV. CONCLUSION

The rapid development of the Internet and websites like eBay have created new ways for sellers and buyers to connect to each other and to expand their businesses beyond geographical limits. These new markets have also, however, given counterfeiters new opportunities to expand their reach. The Court is not unsympathetic to Tiffany and other rights owners who have invested enormous resources in developing their brands, only to see them illicitly and efficiently exploited by others on the Internet. Nevertheless, the law is clear: it is the trademark owner's burden to police its mark, and companies like eBay cannot be held liable for trademark infringement based solely on their generalized knowledge that trademark infringement might be occurring on their websites.

For the reasons stated above, the Court finds that plaintiff has failed to satisfy its burden on all of its claims. The Clerk of the Court shall enter judgement for defendant and close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: July 14, 2008
New York, New York

***

Plaintiffs Tiffany (NJ) Inc. and Tiffany and Company are represented by H. Peter Haveles, Jr., Esq. and James B. Swire, Esq., (Eleanor M. Lackman, Esq., and Erik C. Walsh, Esq., *on the briefs*), Arnold & Porter LLP, 299 Park Avenue, New York, New York 10022. Defendant eBay, Inc., is represented by Bruce S. Meyer, Esq., Robert Bruce Rich, Esq., and Randi W. Singer, Esq., (Mark J. Fiore, Esq., and Lori M. Schiffer, Esq., *on the briefs*), Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10023.